**UNITED STATES of America, Appellee,**

**v.**

**Howard T. WINTER, Defendant, Appellant.**

**No. 94–2302.**

United States Court of Appeals, First Circuit.

Heard Sept. 15, 1995.

Decided Nov. 22, 1995.

Thornton E. Lallier, Amesbury, MA, for appellant.

George W. Vien, Assistant United States Attorney, with whom Geoffrey E. Hobart, Assistant United States Attorney, and Donald K. Stern, United States Attorney, were on brief, Boston, MA, for the United States.

Before STAHL, Circuit Judge, CAMPBELL, Senior Circuit Judge, and LYNCH, Circuit Judge.

STAHL, Circuit Judge.

Appellant Howard T. Winter refused to testify in a former codefendant's criminal trial despite a grant of immunity. The United States District Court for the District of Massachusetts adjudged Winter in criminal contempt under Fed.R.Crim.P. 42(a) and imposed a six-month sentence consecutive to one under which he was already incarcerated. In this appeal, Winter challenges certain aspects of the summary contempt proceedings and the resulting sentence. We affirm.

## I.

### Factual Background and Prior Proceedings

In January 1992, a grand jury returned a multiple-count indictment against Winter and two codefendants, Gennaro Farina and Kenneth Schiavo. In May 1993, Winter and

Farina each pleaded guilty to the indictment, received the mandatory minimum sentence of ten years imprisonment, and were accordingly incarcerated. In September 1994, after futile efforts to interview Winter, the government obtained an immunity order pursuant to 18 U.S.C. §§ 6002 and 6003 to compel his testimony in the criminal trial against his former codefendant, Schiavo.

Schiavo's trial began on November 14, 1994. During the following two days, on November 15 and 16, 1994, the district court held a contempt hearing because Winter indicated that he would refuse to testify despite the immunity order. At the hearing, Winter stated that his refusal to testify was based upon the Fifth Amendment of the United States Constitution and "other reasons." After the court explained to Winter that, because of the immunity order, the Fifth Amendment was not a valid basis to refuse to testify, Winter proffered his non-Fifth-Amendment reasons for his refusal, to wit: (1) that his previous counsel told him that his guilty plea would not in any way affect Schiavo, and that, if Winter had known he might be forced to testify against Schiavo, he would not have so pled; and, (2) because he had consistently maintained to the government his resolute unwillingness to testify against Schiavo, the government was being "vindictive" by forcing him to choose between testifying or suffering a contempt judgment. Winter also implied that he feared for his own safety should he testify against Schiavo.[1]

During the second day of the contempt hearing, Richard Egbert, Winter's counsel during his guilty plea proceedings, testified as to Winter's understanding that a guilty plea would not have an adverse effect on Schiavo. Egbert further stated that he told Winter that, in his opinion, it was unlikely the government would attempt to force Winter to testify against Schiavo. Egbert also testified that Winter entered his guilty plea without a plea agreement or any other agreement with the government.

The district court found that, despite Winter's claimed misunderstanding of what could happen, the government never promised that it would not immunize and call him to testify against Schiavo, nor did Egbert tell him that. The court found that the government's conduct leading up to and including its efforts to secure Winter's testimony did not violate due process. The court further found that Winter's testimony would be probative of material issues in Schiavo's trial, and because of an earlier suppression ruling, was not cumulative to other evidence.

Throughout the contempt proceedings, the district court made clear that it was operating under Fed.R.Crim.P. 42(a)[2] which provides for summary disposition of criminal contempt. The court did state, however, that it "would consider reducing the contempt or eliminating it entirely, should [Winter] decide to testify." In making this statement, the court expressly relied upon *United States v. Wilson*, 421 U.S. 309, 312, 95 S.Ct. 1802, 1804, 44 L.Ed.2d 186 (1975). The court repeated several times its offer to purge Winter of contempt and any sentence imposed because of it if he decided to testify before the close of the government's case in the Schiavo trial. After Winter refused to obey its direct order to testify, the court held him in contempt and summarily sentenced him to six months imprisonment.

After hearing argument by counsel, the district court decided during the contempt hearing that Winter's sentence would run consecutively to his prior sentence because imposition of a concurrent term would "provide[ ] no incentive whatsoever" for him to testify. In making this determination, the

---

1. Winter's only statement suggesting this fear was the following: "When [the government] sent me to Louisburg, ... they leaked the rumor out that I had rolled over, with one intention, to try and get me killed when I was doing my time down there." At the time Winter made this statement, the court was in the process of explaining immunity protections and did not pursue his apparent claim of fear.

2. Rule 42(a), pertaining to summary disposition of criminal contempt, provides:

A criminal contempt may be punished summarily if the judge certifies that the judge saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.

Fed.R.Crim.P. 42(a).

court stated, "my goal is not to punish, my goal is to get testimony which is relevant." At the request of Winter's counsel, after the imposition of the contempt sentence, the court deferred entry of the judgment to the close of the Schiavo trial, explaining, "my hope, although I think it's elusive at this point, is still that [Winter] will testify." The court left the door open for Winter to justify at some later time, through his counsel, his recalcitrance.[3] Despite this opportunity, Winter proffered nothing more to explain his refusal to testify.

Winter never testified in the Schiavo trial; nonetheless, on December 1, 1994, the jury found Schiavo guilty on some but not all counts against him in the superseding indictment. On December 12, 1994, the district court issued a written order and entered judgment against Winter for criminal contempt. Accordingly, Winter received a six-month prison sentence to be served consecutively to his prior sentence. This appeal followed.

## II.

### Discussion

On appeal, Winter raises a number of arguments to challenge his contempt conviction. First, he reasserts his non-Fifth-Amendment grounds for refusing to testify. Second, he argues that the court's contempt sanction was of a civil rather than criminal nature and should have been vacated upon completion of Schiavo's trial. Third, Winter contends that the district court failed to afford him an opportunity to document his fear of testifying against Schiavo. Finally, Winter argues that imposition of the contempt sentence violated the Double Jeopardy Clause of the United States Constitution.

### A. Standard of Review—Plain Error

■ Winter failed to raise these arguments, except for the first, before the district court. Thus, the arguments raised for the first time on appeal are forfeited and reversible only if Winter establishes "plain error."

*United States v. Alzanki*, 54 F.3d 994, 1003 (1st Cir.1995), *petition for cert. filed*, 64 U.S.L.W. 3298 (U.S. Oct. 16, 1995) (No. 95–619); *United States v. Taylor*, 54 F.3d 967, 972–73 (1st Cir.1995). Under this standard, an appellant bears the burden of establishing: (1) "error," *i.e.*, a "[d]eviation from a legal rule"; (2) that the error is "plain" or "obvious"; and (3) that the plain error affected "substantial rights." *United States v. Olano*, 507 U.S. 725, ——–——, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993); *see* Fed.R.Crim.P. 52(b). Even if an appellant establishes plain error affecting substantial rights, the decision to correct that error lies within the sound discretion of this court. *Olano*, 507 U.S. at ——, ——, 113 S.Ct. at 1776, 1778; *see United States v. Marder*, 48 F.3d 564, 571 (1st Cir.), *cert. denied*, — U.S. ——, 115 S.Ct. 1441, 131 L.Ed.2d 320 (1995).

### B. The Government's Conduct and the Propriety of the Immunity Order

Winter reasserts on appeal his claim that, because government agents always knew he would refuse to testify, they sought his immunity for the vindictive purpose of "setting him up" to commit perjury or contempt. Winter further contends that because he had already pleaded guilty, there was no criminal liability left for the government to immunize him from; and because the immunity conferred no real benefit upon him, it was an "illusory" grant that could not form the basis of a contempt finding.

■ We review the district court's contempt finding for abuse of discretion. *In re Grand Jury Proceedings (Doe)*, 943 F.2d 132, 136 (1st Cir.1991) (*per curiam*). We review factual findings in contempt proceedings for clear error. *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 15 (1st Cir.1991). To the extent Winter's arguments raise pure questions of law, our review is plenary.

■ First, we note that the record reveals the district court's utmost solicitude in addressing these concerns. The court held the contempt hearing in part to determine if

---

3. Specifically, the court stated to Winter's counsel: "I know this has all come up very suddenly for you, Mr. Cullen. If there is something that you haven't told me about ... which you think would be relevant, I will listen to it at the time you find out about it."

there was any overreaching conduct by the government in obtaining the immunity order or in negotiating Winter's earlier guilty plea. Despite a full exploration of Winter's contentions, which included calling Winter's former counsel to testify, the court found no evidence of misconduct. Rather, the court found that the government had legitimate reasons to seek Winter's highly relevant testimony because the evidence in the Schiavo trial contained repeated references to Winter's participation in criminal activities with Schiavo. We find no error in the court's finding that the government did not act out of vindictiveness in seeking the immunity order and Winter's testimony. *Cf. In re Poutre,* 602 F.2d 1004, 1006 (1st. Cir.1979) (noting the impermissibility of "calling a witness for the sole purpose of extracting perjury" but finding no evidence of such government misconduct).

▮ Next, we note the tortured logic of Winter's argument that his recalcitrance was justified because he had no criminal liability to barter for the immunity. Winter's argument suggests that he had a right to keep silent—despite the absence of Fifth–Amendment privilege concerns—simply because he had nothing to gain by the grant of immunity. This contention, however, cannot be reconciled with the duty of every citizen to testify in aid of law enforcement. *Piemonte v. United States,* 367 U.S. 556, 559 n. 2, 81 S.Ct. 1720, 1722 n. 2, 6 L.Ed.2d 1028 (1961); *see also Kastigar v. United States,* 406 U.S. 441, 443–44, 92 S.Ct. 1653, 1655–56, 32 L.Ed.2d 212 (1972). "If two persons witness an offense—one being an innocent bystander and the other an accomplice who is thereafter imprisoned for his participation—the latter has no more right to keep silent than the former." *Piemonte,* 367 U.S. at 559 n. 2, 81 S.Ct. at 1722 n. 2 (dicta). Thus, even assuming—as Winter contends—that his guilty plea dispensed with the need for an immunity order, we fail to see how he was harmed

by the immunity's added protection when he otherwise would have a duty to testify. Winter apparently believed that his earlier guilty plea would relieve him of all obligations with respect to his activity with Schiavo. That mistaken belief, however, is not a basis upon which to excuse his refusal to testify.

### C. The Nature of the Contempt Sanction

▮ Winter argues that his contempt sanction was of a civil rather than criminal nature because the district court expressed a goal to compel testimony rather than to punish, and repeated its offer to purge Winter of the contempt sentence should he testify. Winter contends that, because the judgment was effectively for civil contempt, it should have been vacated once its coercive effect ceased, *i.e.,* at the end of Schiavo's trial when he was no longer able to comply with the order.

▮ The determination of whether a contempt order is civil or criminal is a question of law and the district court's characterization of the sanction is not binding upon this court. *See Hicks ex rel. Feiock v. Feiock,* 485 U.S. 624, 630, 108 S.Ct. 1423, 1429, 99 L.Ed.2d 721 (1988). Winter, however, neither raised this argument in the district court, nor moved in district court to vacate his contempt sentence on this basis. Because Winter did not afford the district court an opportunity to address this issue, he has forfeited his right to complain here on this basis. *See United States v. Taylor,* 54 F.3d 967, 971 (1st Cir.1995) (noting that policy behind forfeiture rule is to allow trial court to timely correct the problem, and to prevent "sandbagging"). In light of this forfeiture, we review the proceedings for plain error under the principles set forth in Section II. A., above. *Cf. In re Grand Jury Proceedings,* 875 F.2d 927, 932 (1st Cir.1989) (reviewing for plain error due process objections to criminal contempt proceedings that were not raised in trial court).[4] To address

---

4. We note that Winter's counsel at the contempt hearing implicitly conceded the appropriateness of the criminal nature of the proceedings when arguing against the consecutive imposition of the contempt sentence. Specifically, counsel requested:

I prefer that ... [Winter] be ordered to start serving [the] sentence for contempt immediately.... That's what would happen on civil contempt.... That is, if he was held in civil contempt and refused to testify, it would not be counted toward his time on his sentence [for Bureau of Prisons purposes].

Winter's contention, we discuss the pertinent caselaw, below.

 The distinction between civil and criminal contempt is important because each requires different procedures. Generally, a court may impose civil contempt sanctions pursuant to the minimal procedures of notice and an opportunity to be heard; the reason for this is that the civil contemnor may avoid the sanction by obeying the court's order. *International Union, United Mine Workers of America (UMWA) v. Bagwell,* —— U.S. ——, ——, 114 S.Ct. 2552, 2557, 129 L.Ed.2d 642 (1994). In contrast, " 'criminal contempt is a crime in the ordinary sense,' " *id.* at ——, 114 S.Ct. at 2556 (quoting *Bloom v. Illinois,* 391 U.S. 194, 201, 88 S.Ct. 1477, 1481–82, 20 L.Ed.2d 522 (1968)), and criminal contempt sanctions may be imposed only if the court provides certain constitutional protections. *Id.* —— U.S. at —— – ——, 114 S.Ct. at 2556–57; *Hicks,* 485 U.S. at 632, 108 S.Ct. at 1429–30. However, "direct contempts," *i.e.,* those occurring in the court's presence, "may be immediately adjudged and sanctioned summarily." *International Union, UMWA,* —— U.S. at —— n. 2, 114 S.Ct. at 2557 n. 2. In such cases, the distinction between civil and criminal contempt for the purposes of required procedures, in general, is not germane. *Id.* (citing *United States v. Wilson,* 421 U.S. 309, 316, 95 S.Ct. 1802, 1806, 44 L.Ed.2d 186 (1975)); [5] *see Wilson,* 421 U.S. at 315–19, 95 S.Ct. at 1806–08 (upholding summary criminal contempt adjudication where immediate response to direct contempt was necessary to "prevent a breakdown of the proceedings"). As explained below, Winter's contumacious conduct constituted direct contempt.

Winter cites *Shillitani v. United States,* 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966), to support his argument that the nature of his contempt sanction was civil instead of criminal. In *Shillitani,* the trial court ordered the contemnors imprisoned for two years or until they testified before a grand jury. *Id.* at 366–68, 86 S.Ct. at 1533–34. The trial court had stated that the sentence was not intended to punish, but to secure testimony. *Id.* at 368, 86 S.Ct. at 1534. Under the conditional nature of the imprisonment, the contemnors had an unqualified right to be released if they chose to testify; because the contemnors were not otherwise incarcerated, they literally "carried the keys of their prison in their own pockets." *Id.* (internal quotations and citations omitted). Although the parties and courts below had referred to the contempt as criminal instead of civil, the Supreme Court declared that the label affixed to the proceeding was not determinative. *Id.* Instead, the Court looked to the character and purpose of the sentence and found that it was "clearly intended to operate in a prospective manner—to coerce rather than to punish." *Id.* at 369–70, 86 S.Ct. at 1534–35. The Court concluded that the obviously coercive goal of the imprisonment rendered the contempt proceeding civil, and thus the contemnors had to be released when the rationale for their imprisonment vanished, *i.e.,* when the grand jury was discharged. *Id.* at 371–72, 86 S.Ct. at 1536; *see also Hicks,* 485 U.S. at 638 n. 9, 108 S.Ct. at 1433 n. 9.

In *Hicks,* the Supreme Court reaffirmed *Shillitani* 's teaching that the "civil" or "criminal" label attached either to the contempt proceeding or to the corresponding relief is not controlling. *Hicks,* 485 U.S. at 631, 108 S.Ct. at 1429. In *Hicks,* an indirect contempt case, a state judge found a parent in contempt for failure to comply with a

Viewing these statements in light of the record as a whole, however, we do not find that they amount to an actual "waiver" of Winter's right to argue that his contempt sanction was civil. *See Olano,* 507 U.S. at ——, 113 S.Ct. at 1777 (explaining that actual waiver, as distinct from forfeiture, extinguishes any "error" under Rule 52(b) such that plain error review is inapplicable); *cf. United States v. Rivera,* 872 F.2d 507, 509 (1st Cir.) (finding plain error rule applicable where evidence was insufficient to establish de-

fendant's waiver of double jeopardy defense), *cert. denied,* 493 U.S. 818, 110 S.Ct. 71, 107 L.Ed.2d 38 (1989).

5. The civil/criminal contempt distinction in direct contempt cases becomes relevant if the criminal contempt is "serious" and adjudication requires a jury trial. *International Union, UMWA,* —— U.S. at —— n. 2, 114 S.Ct. at 2557 n. 2 (citing *Bloom v. Illinois,* 391 U.S. 194, 209–210, 88 S.Ct. 1477, 1486–1487, 20 L.Ed.2d 522 (1968)).

child-support order. *Id.* at 626–27, 108 S.Ct. at 1426–27. The main issue in *Hicks* was whether the state contempt proceeding was civil or criminal for the purposes of determining the applicability of federal constitutional protections. *Id.* at 630, 108 S.Ct. at 1429. To guide in this analysis, *Hicks* instructed that "the critical features are the substance of the proceeding and the character of the relief that the proceeding will afford." *Id.* Imprisonment for contempt is for a remedial purpose, and thus civil, if the court conditions the contemnor's release upon compliance with its order. *Id.* at 631–32, 634, 108 S.Ct. at 1429–30, 1431. Such imprisonment is for punitive purposes (to vindicate the court's authority), and hence criminal, if the court imposes an unconditional determinate sentence "retrospectively for a 'completed act of disobedience.'" *International Union, UMWA,* —— U.S. at ——, 114 S.Ct. at 2558 (quoting *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 443, 31 S.Ct. 492, 498–99, 55 L.Ed. 797 (1911));[6] *Hicks,* 485 U.S. at 631–33, 108 S.Ct. at 1429–30.

*Hicks* further explains that the classification of contempt proceedings as civil or criminal does not "turn simply on what their underlying purposes are perceived to be," because, "[i]n contempt cases, both civil and criminal relief have aspects that can be seen as either remedial or punitive or both." *Id.* at 635, 108 S.Ct. at 1431; *see also International Union, UMWA,* —— U.S. at ——, 114 S.Ct. at 2557 (recognizing contempt sentences' dual purpose of punishment and coercion). In order to draw a conclusion about whether a contempt proceeding is criminal or civil, a court must examine "the character of the relief itself," *id.* 485 U.S. at 636, 108 S.Ct.

at 1432, and "[t]he critical feature that determines whether the remedy is civil or criminal in nature is ... whether the contemnor can avoid the sentence imposed on him, or purge himself of it, by complying with the terms of the original order." *Id.* at 635 n. 7, 108 S.Ct. at 1431 n. 7; *see also id.* at 640, 108 S.Ct. at 1434 ("If the relief imposed here is in fact a determinate sentence with a purge clause, then it is civil in nature." (citing *Shillitani,* 384 U.S. at 370 n. 6, 86 S.Ct. at 1536 n. 6)).

In adjudicating Winter's contempt, the district court relied heavily, if not solely, upon *United States v. Wilson,* 421 U.S. 309, 95 S.Ct. 1802, 44 L.Ed.2d 186 (1975). In *Wilson,* the Supreme Court considered a case almost factually identical to Winter's. Defendants who were already incarcerated on guilty-plea convictions received immunity but refused to testify in an ongoing criminal trial against a former codefendant. *Id.* at 312, 95 S.Ct. at 1804–05. After conducting summary criminal contempt proceedings pursuant to Fed.R.Crim.P. 42(a), the court sentenced the defendants to six months imprisonment, consecutive to their previously imposed sentences. *Id.* Despite his imposition of a definite imprisonment term, the district judge "made it clear that he would consider reducing the contempt sentences, or eliminating them completely, if [the defendants] decided to testify." *Id.*

 *Wilson* did not squarely involve the issue of the distinction between civil and criminal contempt. Rather, the primary issue in *Wilson* was whether, under the facts of the case, summary proceedings under Rule 42(a) were proper instead of disposition upon notice and hearing under Rule 42(b).[7]

6. *International Union, UMWA,* —— U.S. at ——
——, 114 S.Ct. at 2555–57, involving the civil/criminal classification of contempt fines against a union for a labor injunction violation, is also an indirect contempt case.

7. In his reply brief to this court, Winter argues, for the very first time, that because his attorney had not been provided with reasonable time to prepare a defense in the criminal contempt proceeding, the district court violated Fed.R.Crim.P. 42(b). This contention ignores the fact that Rule 42(b)'s notice provision, which encompasses the "reasonable time" requirement, does not apply when a court, as here, proceeds under Rule 42(a). *See* Fed.R.Crim.P. 42(b).

Winter also suggests in his reply brief, for the first time, that the district court erred in proceeding under Rule 42(a) instead of Rule 42(b). Our review of this argument, such as it is, is for plain error because Winter did not first present it to the district court.

Winter's refusal to testify constituted contemptuous conduct because, like the contumacious behavior of the *Wilson* defendants, it was an "intentional obstruction[ ] of court proceedings that literally disrupted the progress of the trial and hence the orderly administration of justice." *Wilson,* 421 U.S. at 315–16, 95 S.Ct. at 1806. Unlike a refusal to testify before a grand jury, Winter's refusal to testify in Schiavo's ongoing

*See generally id.* Because summary adjudication of indirect contempt is impermissible, *Wilson* was clearly a "direct contempt" case, *see International Union, UMWA*, ― U.S. at ― n. 2, ―, 114 S.Ct. at 2557 n. 2, 2560; similarly, it is beyond dispute that Winter's conduct constituted a direct contempt, which was adjudicated as such. *See supra*, note 7.

The *Wilson* Court upheld the judge's use of the summary criminal contempt provision. In approving this procedure, the Court acknowledged the dual purpose of the contempt sanction:

> The face-to-face refusal to comply with the court's order itself constituted an affront to the court, and when that kind of refusal disrupts and frustrates an ongoing proceeding, as it did here, summary contempt must be available to vindicate the authority of the court *as well as to provide the recalcitrant witness with some incentive to testify. Whether such incentive is necessary in a particular case is a matter the Rule wisely leaves to the discretion of the trial court.*

*Wilson*, 421 U.S. at 316–17, 95 S.Ct. at 1806–07 (emphasis added) (footnote and citation omitted); *see also id.* at 319, 95 S.Ct. at 1808 ("In an ongoing trial, with the judge, jurors, counsel and witnesses all waiting, Rule 42(a) provides an appropriate remedial tool to discourage witnesses from contumacious refusals to comply with lawful orders essential to prevent a breakdown of the proceedings.").

In the context of approving the summary contempt procedures and other contexts, the *Wilson* Court favorably noted "the careful

---

criminal trial threatened a "breakdown of the proceedings" that required the immediate remedial tool of Rule 42(a). *See id.* at 319, 95 S.Ct. at 1808. This conclusion is bolstered by the court's specific finding that Winter's testimony would be highly relevant to material issues in Schiavo's trial.

Winter insists that because the government obtained a guilty verdict on some of the counts against Schiavo, "[t]he case never broke down," and thus, *Wilson* is inapposite. This 20/20 hindsight, however, was not available at the time Winter refused to testify—in the middle of trial. *See United States v. North*, 621 F.2d 1255, 1262 n. 11 (3d Cir.1980) (en banc) (noting, for purposes of seeking contemnor's testimony, that the fact that defendant was eventually convicted

trial judge['s]" offer to consider reducing the defendants' contempt sentences should they later agree to testify. *See id.* at 312, 315 n. 7, 317 n. 9, 95 S.Ct. at 1804–05, 1806 n. 7, 1807 n. 9. Although the issue was not directly before it, the *Wilson* Court did not hint that the judge's offer to reduce or eliminate the sentences automatically converted the sanction from criminal to civil. To the contrary, the Court acknowledged the need for the criminal rather than civil contempt sanction, under the facts of the case, in noting that *Shillitani*'s admonition to first consider the feasibility of coercing testimony through civil contempt has little weight when the contemnor is already imprisoned; and in such cases, the threat of incarceration provides little incentive to testify. *Id.* at 317 n. 9, 95 S.Ct. at 1807 n. 9; *see also United States v. McVeigh*, 896 F.Supp. 1549, 1555 (W.D.Okla.1995) (proceeding under criminal contempt provision because defendant's incarcerated status rendered civil contempt proceedings "futile" (citing, *inter alia*, *Wilson*, 421 U.S. at 317 n. 9, 95 S.Ct. at 1807 n. 9)).

We must now determine how *Shillitani/Hicks* and *Wilson* interact under the facts of the instant case. Because the district court promised to purge Winter of the contempt sentence if he should testify, and because the court at one point expressly stated that its goal was not to punish but to obtain relevant testimony, *Shillitani* and *Hicks* would seem, at first glance, to command a civil characterization of the proceedings. However, *Shillitani* and *Hicks* are factually distinct from *Wilson* and the instant case;

---

without the testimony is irrelevant), *cert. denied*, 449 U.S. 866, 101 S.Ct. 199, 66 L.Ed.2d 84 (1980). We therefore find, under the facts of this case—so strikingly similar to those in *Wilson*—that the district court did not abuse its discretion in deciding to proceed under Rule 42(a) rather than Rule 42(b) when faced with Winter's direct contempt. *See Wilson*, 421 U.S. at 319, 95 S.Ct. at 1808 (noting that appellate courts may curb abuses of discretion of Rule 42(a) authority "without unduly limiting the power of the trial judge to act swiftly and firmly to prevent contumacious conduct from disrupting the orderly progress of a criminal trial"). Because the court did not abuse its discretion in proceeding under Rule 42(a), there is no reversible error.

that dissimilarity is dispositive here. In *Shillitani,* the contemnors were not already incarcerated when subjected to the contempt sentence, and their refusal to testify was before a grand jury rather than at an ongoing trial.[8] *Shillitani,* 384 U.S. at 368–69, 86 S.Ct. at 1534–35. *Hicks* was an indirect contempt case that involved neither an already-incarcerated contemnor nor a failure to testify at a proceeding.[9] *See Hicks,* 485 U.S. at 626–27, 108 S.Ct. at 1426–27.

In contrast, *Wilson* and this case involved already-incarcerated contemnors who refused to testify at an ongoing criminal trial, and whose direct contempt threatened a "breakdown of the proceedings." *Wilson,* 421 U.S. at 319, 95 S.Ct. at 1808. In *Wilson,* the Supreme Court specifically endorsed the use of criminal contempt proceedings in cases where, as here, a civil sanction would have no coercive effect because of the incarcerated status of the contemnor. *Wilson,* 421 U.S. at 317, n. 9, 95 S.Ct. at 1807 n. 9. Thus from the outset of Winter's contempt hearing, the district court expressly relied upon *Wilson* for guidance in conducting its summary criminal contempt proceedings under Fed.R.Crim.P. 42(a). The court also stated that it was following the lead of "the wise trial judge ... in [*Wilson* ]" by generously offering to purge Winter of the contempt should he decide to testify. In its written order and findings on contempt, the court cited *Wilson,* 421 U.S. at 317 n. 9, 95 S.Ct. at 1807 n. 9, in acknowledging that "[a]lthough lesser sanctions should ordinarily be invoked when equal to the task, anything less than criminal contempt would pose no serious deterrent to an individual already incarcerated." It is clear, therefore, that the district court was aware of the alternative of civil contempt proceedings, but felt that the coercive component of such proceedings would be woefully inadequate.

Winter would have this court hold that, even under *Wilson* -like facts, a court's promise to purge triggers the *Shillitani/Hicks* contempt-classification principles, such that the contempt sanction must be characterized as civil. We decline to do so. Otherwise, a trial judge faced with an incarcerated, recalcitrant witness during an ongoing trial would have to choose between a civil contempt sanction with little or no coercive value, or a determinate criminal sentence with no possibility of purging the sentence should the contemnor testify. Under either choice, the judge cannot fashion a contempt sanction to provide a meaningful incentive to testify. If we were to hold that an offer to purge, under the facts of this case, automatically converts the contempt sanction from criminal to civil, we would effectively strip the trial judge of the recognized discretion under Rule 42(a) to provide an incentive to testify. *See Wilson,* 421 U.S. at 316–17, 95 S.Ct. at 1806–07. It would be poor policy to preclude the district judge from exercising such discretion by imposing an unwavering rule that an incarcerated criminal contemnor cannot be given an opportunity to comply with an order and purge the contempt, even if the court wishes to provide such opportunity.

■ While the district court may have indicated its preference not to punish Winter and its fading hope that he would testify, it rejected as ineffective any procedure other than summary criminal contempt under Rule 42(a). Winter's incarcerated status and his disruption of the Schiavo trial required this procedure in order to both vindicate the court's authority and provide some incentive to testify. The criminal nature of the contempt sanction is further evidenced by an aspect of the relief, stemming from a request by Winter's counsel: the court's unusual procedural device of delaying entry of the final contempt judgment—although sentence had been imposed—until after Schiavo's trial,

---

**8.** In determining whether or not to follow the procedure of Rule 42(a) or Rule 42(b), it is significant whether the contemnor is called to a grand jury or an ongoing trial. Because a grand jury's schedule is generally flexible when encountered with a recalcitrant witness, any delay due to Rule 42(b) proceedings is usually less disruptive than such delay during a trial. *Wilson,* 421 U.S. at 318–19, 95 S.Ct. at 1807–08.

**9.** Similarly, *International Union, UMWA,* involving the classification of serious contempt fines for violations of a labor injunction (indirect contempt), is significantly factually distinct from this case. *International Union, UMWA,* —— U.S. at —— - ——, 114 S.Ct. at 2555–56.

when there was no longer an opportunity for Winter to comply. Thus, although the proceeding at one time had a coercive component, the contempt judgment, once entered, retrospectively punished Winter for a " 'completed act of disobedience,' " which is typical of criminal contempt. *International Union, UMWA,* —— U.S. at ——, 114 S.Ct. at 2558 (quoting *Gompers*, 221 U.S. at 443, 31 S.Ct. at 498).[10] The deferred entry of the contempt judgment also furthered the twin goals of vindication and coercion in these contempt proceedings.[11]

The issue of whether the district court's contempt proceedings were civil or criminal in nature is complicated here because the court so strongly expressed a coercive goal. However, the particular facts of this case maintain the criminal nature of the contempt sanction, despite the court's discretionary choice under Rule 42(a) to provide an incentive to testify. *See also United States v. North,* 621 F.2d 1255, 1263–1265 & n. 16 (3d Cir.) (en banc) (stating in dicta that defendant's contempt sentence, even if partly conditional upon compliance, would retain its criminal nature and thus continue after completion of the underlying trial (citing, *inter alia, Wilson,* 421 U.S. at 312, 95 S.Ct. at 1804–05)), *cert. denied,* 449 U.S. 866, 101 S.Ct. 199, 66 L.Ed.2d 84 (1980). Therefore, we find no error—certainly no "plain" error—in the district court's criminal contempt proceeding and disposition. Winter's attempt to use the court's generous offer to purge as a means of recharacterizing the contempt proceedings from criminal to civil is unavailing. We find it appropriate to add the Supreme Court's observation in the factually-similar *Wilson* case:

> [A]s this case demonstrates, a contumacious refusal to answer not only frustrates the [trial] inquiry but can destroy a prosecution. Here it was a prosecution; the

same kind of contumacious conduct could, in another setting, destroy a defendant's ability to establish a case.

*Wilson,* 421 U.S. at 316, 95 S.Ct. at 1806.

### D. Opportunity to Document Fear

 Winter argues that the district court abused its discretion in finding him in contempt because he tried to explain to the court his fear for his own safety, but was not given an opportunity to document that fear. Because Winter raises this argument for the first time on appeal, we review for plain error.

We note first that Winter is factually wrong in his assertion that he was denied an opportunity to establish his fear. While it is true that the district court apparently cut short any further testimony on the possible claim of fear, the court did expressly give Winter, through counsel, the opportunity to lodge any new facts or arguments to justify his recalcitrance. *See supra* notes 1, 3. During the twenty-six days from the close of the hearing until the entry of judgment, Winter did not take advantage of this opportunity to document his fear; he cannot now complain of that failure. *See In re Grand Jury Proceedings (Doe),* 943 F.2d at 136 (noting with disapproval a contemnor's failure to submit favorable proffer during a twenty-four hour extended filing period).

 Moreover, as Winter admits, even if he had fully elucidated his fear of testifying against Schiavo, "it has been widely held that a witness' fear of reprisal against himself or his family does not constitute just cause for refusing to testify." *In re Grand Jury Proceeding (Doe),* 13 F.3d 459, 461 (1st Cir.1994); *see also Piemonte,* 367 U.S. at 559 n. 2, 81 S.Ct. at 1722 n. 2 (noting in dicta that "fear of reprisal offers an immunized prison-

---

10. To the extent the contempt sanction lost all remedial purpose by the time the judgment issued, the procedures required for punitive, criminal sanctions were constitutionally adequate. *See supra,* note 7; *see also United States v. Michaud,* 928 F.2d 13, 15 n. 1 (1st Cir.1991) (noting both conditional and unconditional aspects of sentence, but finding that even assuming contempt proceedings were criminal, defendant received the required procedural protections).

11. Because the district court held Winter in contempt and imposed sentence at the time of the hearing, the delayed judgment does not constitute an impermissible summary adjudication after trial, when due process would require notice and a hearing. *See International Union, UMWA,* —— U.S. at——, 114 S.Ct. at 2560 (citing *Taylor v. Hayes,* 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974)).

er no more dispensation from testifying than it does any innocent bystander without a record"). Indeed, a reticent witness' fear for personal safety is potentially relevant only in sentence-mitigation. *See United States v. Gomez*, 553 F.2d 958, 959 (5th Cir.1977) (citing *Harris v. United States*, 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965)). Hence, although proof of a legitimate fear for his safety would not have justified Winter's refusal to testify in any event, it might have factored only in mitigation of the six-month contempt sentence had he taken advantage of the district court's generous offer to elaborate upon the grounds for his reticence.[12] We discern no error based on this argument to the proceedings below.

*E. Double Jeopardy*

■ Winter's final argument is that the prohibition against double jeopardy invalidates the contempt sentence both because of its very imposition and because of its consecutive nature. Again, our review is for plain error because Winter failed to make this argument below. *See United States v. Rivera*, 872 F.2d 507, 509 (1st Cir.) (reviewing defendant's double jeopardy argument for plain error because he failed to raise it in trial court), *cert. denied*, 493 U.S. 818, 110 S.Ct. 71, 107 L.Ed.2d 38 (1989); *cf. United States v. Papadakis*, 802 F.2d 618, 621 (2d Cir.1986) (declining to reach appellant's claim, raised for the first time on appeal, that double jeopardy barred criminal contempt prosecution), *cert. denied*, 479 U.S. 1092, 107 S.Ct. 1304, 94 L.Ed.2d 159 (1987).

Winter appears to concede in his opening brief to this court that the Double Jeopardy Clause generally does not bar a contempt conviction for the refusal to answer questions related to a criminal offense for which the defendant has already been convicted. In his reply brief, however, Winter changes his tune and asserts that the principles of double

jeopardy are violated here because "the contempt sentence relates to the same or similar activity ... to which Winter had previously pleaded guilty." Winter additionally argues that imposing the six-month sentence consecutively to, rather than concurrently with, his ongoing sentence violates the Double Jeopardy Clause because it "materially altered the terms and conditions of his existing incarceration." To this end, Winter asserts without elaboration that the additional six-month consecutive sentence disqualifies him "for certain programs and treatments inside the prison."

Winter cites *United States v. Bynoe*, 562 F.2d 126, 128 (1st Cir.1977), as support for his contention that the Double Jeopardy Clause bars the purported "material alteration" of his existing sentence by the added contempt sentence. In *Bynoe*, the district court vacated its previous order to suspend the defendant's sentence—even though the defendant had begun to serve probation—and imposed a "more severe" disposition because of perceived misrepresentations by the defense. 562 F.2d at 127–28. We found that the prohibition against double jeopardy precluded this increased punishment for the very same crime. *Id.* at 129. Thus, *Bynoe* merely reiterates the rule that double jeopardy bars "an increase in sentence after the defendant has commenced serving his punishment." 562 F.2d at 128; *see also United States v. Benefield*, 942 F.2d 60, 66 (1st Cir. 1991) (holding that sentencing court may not amend a sentence to run consecutively once defendant began serving it as a concurrent sentence) (citing *Bynoe* and other cases)).

■ It is beyond dispute, however, that the district court imposed Winter's contempt sentence for disobedience of its direct order—an offense completely independent of the charges under which he was already incarcerated.[13] Moreover, it was within the court's discretion to impose the sentence con-

---

12. At oral argument before this panel, the government stated that Winter had refused an offer to enroll in the federal witness protection program. Assuming this representation is true, we note our repeated admonition that a witness may not at the same time refuse to testify because of fear for his or her own safety, and reject offers of protection from that potential danger. *See In re*

*Grand Jury Proceeding (Doe)*, 13 F.3d at 462–63 (listing cases).

13. Winter cites no authority, and we have found none, in support of his assertion that his contempt judgment for refusing to testify about crimes to which he has already pleaded guilty constitutes double jeopardy.

secutively instead of concurrently in order to preserve the incentive value of the contempt citation. In no way did the court attempt to alter or increase Winter's prior sentence as proscribed by *Bynoe* and *Benefield*.[14] Thus, Winter's contention that he is twice punished for the crimes to which he pleaded guilty or that the consecutive sentence impermissibly increased a prior-imposed punishment is unavailing.

### III.

### *Conclusion*

For the foregoing reasons, the judgment of the district court is *affirmed.*

**14.** The purported administrative changes to the manner in which Winter's sentence is served in *prison because of the* added sentence are within the Bureau of Prison's domain. Any complaint of constitutional magnitude that Winter might have regarding the Bureau of Prison's treatment of him given the added sentence is not properly before us in this appeal.