

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-7-2003

# USA v. Warren

Precedential or Non-Precedential: Precedential

Docket No. 02-3110P

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"USA v. Warren" (2003). *2003 Decisions.* Paper 307.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/307

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed August 7, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-3110

UNITED STATES OF AMERICA

v.

ISAIAH WARREN,

Appellant

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 00-cr-00115)
District Judge: The Honorable Donald E. Ziegler

Argued: May 14, 2003

Before: RENDELL, SMITH and ALDISERT, *Circuit Judges*

(Filed: August 7, 2003)

SHELLEY STARK, Federal Public
  Defender
LISA B. FREELAND, Assistant
  Federal Public Defender (argued)
1450 Liberty Center
1001 Liberty Avenue
Pittsburgh, PA 15222

ATTORNEYS FOR APPELLANT

MARY BETH BUCHANAN,
 United States Attorney
GREGORY NESCOTT,
 Assistant United States Attorney
BONNIE R. SCHLUETER,
 Assistant United States Attorney
KELLY R. LABBY, Assistant
 United States Attorney (argued)
633 U.S. Post Office and Courthouse
Pittsburgh, PA 15219

ATTORNEYS FOR APPELLEE

---

## OPINION OF THE COURT

---

ALDISERT, *Circuit Judge.*

This appeal by Isaiah Warren from his sentence in the United States District Court for the Western District of Pennsylvania following a guilty plea requires us to decide whether a defendant may invoke the Fifth Amendment and refuse to provide the government with additional information pursuant to Title 18, United States Code, Section 3553(f)(5), incorporated by United States Sentencing Guideline § 5C1.2 (the "Safety Valve") and still have the advantage of these provisions.[1] We affirm the

---

1. Warren also argues that the sentencing court failed to give an adequate explanation of the "effect" of a supervised release term. Rule 11(c)(1), Federal Rules of Criminal Procedure required that the district court advise the defendant of "the maximum possible penalty provided by law, including the effect of any . . . supervised release term. . . ." (An amendment in 2002 changed the relevant language eliminating the reference to "effects.") The district court here stated, ". . . you can be sent to prison for a term of imprisonment of not less than ten years, . . . [with] a term of supervised release of at least five years when you are released from prison. . . ." App. at 29. Warren urges that the district court was required to advise that he could be imprisoned if he violated supervised release. For our purposes, we do not decide whether the court's statement satisfied Rule 11 at the time of the plea. It is arguable that it did and, thus, that no "error" occurred. Because Warren failed to raised an objection at trial, the plain error standard of review governs

district court and hold that he may not stay quiet and still qualify for the Safety Valve.

## I.

Warren's troubles began at approximately 8:30 a.m. on May 19, 2000 when members of the Drug Enforcement Administration's Airport Task Force were alerted by a supervisor of the Pittsburgh Federal Express facility that four suspicious "FedEx" packages had been intercepted. Each package was addressed to "Mr. and Mrs. Timothy Reed, 376 Mt. Pleasant Road, Pittsburgh, Pennsylvania 15214."

A drug detection dog was called to the facility and alerted to the presence of narcotics. The subsequent execution of a search warrant revealed almost 10 kilograms of cocaine hydrochloride secreted in a variety of baby supplies. Task Force members then repackaged the cocaine in preparation for a controlled delivery.

---

our analysis. *See United States v. Vonn*, 535 U.S. 55, 59 (2002). To succeed under the plain error standard, Warren bears the burden of showing that: "(1) an error was committed; (2) the error was plain, that is, clear and obvious; and (3) the error affected the defendant's substantial rights[,] . . . [and] [i]n cases where the first three elements are satisfied, an appellate court may exercise its discretion to order such a correction only if the error, seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Dixon*, 308 F.3d 229, 234 (3d Cir. 2002) (citations and quotations omitted).

We conclude that Warren's substantial rights were not affected. An error "affected substantial rights" if the error was prejudicial to the defendant and had affected the outcome of the district court proceeding. *United States v. Olano*, 507 U.S. 725, 732 (1993). Although in *United States v. Powell*, 269 F.3d 175 (3d Cir. 2001), we noted that there may be instances where prejudice could be found due to an error involving supervised release, such instances are rare and Warren has failed to convince us that, assuming error, that point was reached here. We are hard pressed to imagine how Warren's decision to plead turned on a complete understanding of the potential for further imprisonment if he violated supervised release. Nor has he convinced us that the colloquy "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Dixon*, 308 F.3d at 234 (citation and quotation omitted).

Meanwhile, Warren was in wait at 376 Mt. Pleasant Road — the residence of his girlfriend, Rayletta Reed. Reed was unaware of the nature of the impending delivery, but became suspicious after observing peculiar behavior by Warren in the days preceding and including the day of his arrest. Warren spoke to Reed on the day before delivery and requested permission to have packages delivered to her residence. He arrived at the residence some time before 8:30 a.m. on May 19. Throughout the day, Reed observed Warren smoke marijuana and become increasingly nervous as the packages failed to arrive. At least 17 phone calls were placed to FedEx from Reed's residence, inquiring as to the delivery status of the packages. Reed estimated that, at one point, Warren used her phone to call FedEx every 20 minutes.

At approximately 7:40 p.m., a Task Force member posing as a FedEx employee delivered the packages to the Mt. Pleasant residence. Isaiah Warren, waiting outside for the delivery, identified himself and signed for the packages as "Mr. Reed."

Warren was observed placing the packages in the trunk of his car, and, as he prepared to leave the residence, police executed a stop of the vehicle. While being taken into custody without incident, Warren stated, "I can't believe that I'm going to jail for ten kilos." App. at 30; Presentence Investigation Report ¶ 11.

On June 13, 2000, Warren was charged in an indictment with conspiracy to distribute and possess with intent to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. § 846. Warren pleaded guilty to one count of § 846 on August 22, 2000.

At the ensuing plea colloquy, the district court explained to Warren the rights that he would be forfeiting by pleading guilty, inquired as to his competence and his satisfaction with his legal representation, read the charge against him and outlined the elements of the offense. The potential penalties facing Warren were then explained as follows:

BY THE COURT:

Q   . . . Now, if the government can prove each of those elements beyond a reasonable doubt, by statute of

> Congress, you can be sent to prison for a term of imprisonment of not less than ten years, a fine not to exceed $4,000,000.00, a term of supervised release of at least five years when you are released from prison, and you must pay a special assessment in the sum of $100.00.
>
> Now, do you understand those provisions?
>
> A   Yes, sir.
>
> Q   Why are you entering this plea of guilty?
>
> A   I'm guilty.
>
> MR. NESCOTT (U.S. Attorney's Office):  Your Honor, just one addition on the colloquy. The Court mentioned that the penalty is potentially not less than ten years. Of course, the guideline here actually is a hundred and twenty-one months. It's a technical matter, but potentially the sentence could be up to life as a maximum under this statute.
>
> THE COURT:  Very good, sir.

App. at 29. The government proceeded to summarize its evidence against Warren, and the district court ultimately accepted Warren's plea. Warren lodged no objection.

Under the terms of the plea agreement, the government agreed to take the following action: (1) recommend to the court that the offense level of 32 not be increased under U.S.S.G. § 3B1.1 (Aggravating Role); (2) recommend that the court reduce the offense level by three levels for acceptance of responsibility under U.S.S.G. § 3E1.1; (3) accept a stipulation as to drug quantity; and (4) recommend to the court that Warren be sentenced without regard to any mandatory minimum sentence pursuant to the Safety Valve, U.S.S.G. § 5C1.2, provided that Warren satisfy all its qualifying conditions.

A Presentence Report (PSR) indicated that the base offense level was 32 pursuant to U.S.S.G. § 2D1.1(c)(4) and recommended a decrease of three points for Warren's acceptance of responsibility under § 3E1.1. The PSR recommended against applying the Safety Valve adjustment. It determined that, although Warren satisfied

the qualifying criteria in 18 U.S.C. § 3553(f)(1)-(4), he failed to meet the requirements of subsection (5):

> not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

The PSR fixed Warren's offense level at 29.

Warren's Criminal History Points merited a Category I classification, exposing him to a sentencing range of 87-108 months. However, because the minimum term of imprisonment under 21 U.S.C. § 841(b)(1)(A)(ii)(II) was not less than ten years to a maximum of life, and because Warren did not qualify for the Safety Valve — which would have allowed for a disregard of the statutory minimum — the PSR recommended that his sentence be increased to 120 months pursuant to U.S.S.G. § 5G1.2(c)(2). It also stated that a term of supervised release of no less than five years was required under 21 U.S.C. §841(b)(1)(A)(ii)(II).

Warren objected to the PSR and requested application of the Safety Valve provision notwithstanding his refusal to come forward with "all information and evidence" as required by 18 U.S.C. § 3553(f)(5), arguing that total compliance with the letter of the statute would have placed his family in danger and trenched upon his Fifth Amendment rights. Had the Court accepted this argument, it could have disregarded the mandatory minimum sentence and applied an additional reduction in the base offense level by two levels. This would have positioned Warren at the base level of 27 contemplating a sentencing range of 70-87 months, instead of 120 months. Warren did not object to the five-year mandatory term of supervised release.

The Government remained unsatisfied with the quality of information Warren had provided pursuant to 18 U.S.C.

§ 3553(f)(5). Specifically, the government was interested in the names of buyers and suppliers. App. at 65-66; Br. for Appellant at 9. The district court agreed and rejected the Safety Valve objection, stating "Let's talk about the Fifth Amendment privilege of self-incrimination. It's gone. He has pled guilty." App. at 52. Warren was sentenced to the mandatory minimum of ten years to be followed by five years of supervised release. No direct appeal was taken.

On August 14, 2001, Warren filed a Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255, arguing that his trial counsel was ineffective for failing to file a direct appeal as requested. The parties agreed that Warren's right to bring a direct appeal should be reinstated *nunc pro tunc.* The district court entered the requested order and dismissed the remainder of the Motion to Vacate as premature without prejudice to renew. A timely notice of appeal was filed on July 29, 2002.

The United States District Court for the Western District of Pennsylvania had jurisdiction of the underlying action pursuant to 18 U.S.C. § 3231 based upon Warren's narcotics offense against the laws of the United States. This Court has appellate jurisdiction pursuant to 18 U.S.C. § 1291. Moreover, we have jurisdiction pursuant to 18 U.S.C. § 3742(a)(1), which provides jurisdiction over sentences allegedly imposed in violation of law.

## II.

We exercise plenary review over constitutional claims involving a violation of the Fifth Amendment privilege against self-incrimination. *United States v. Gomez*, 237 F.3d 238, 239 (3d Cir. 2000), *cert. denied*, 532 U.S. 984 (2001). The same standard applies to review of the district court's interpretation and application of the Sentencing Guidelines. *United States v. Thornton*, 306 F.3d 1355, 1358 (3d Cir. 2002).

## A.

"*No person . . . shall be compelled in any criminal case to be a witness against himself. . . .*" U.S. CONST. amend. V.

This staple of constitutional criminal jurisprudence broadly encompasses two distinct privileges: it allows a criminal defendant to refuse to testify at trial; and it allows any person "not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)).

In *Mitchell v. United States*, 526 U.S. 314 (1999), the Court held that a guilty plea in the federal criminal system does not totally waive the defendant's self-incrimination privilege at sentencing as it relates to both the underlying relevant conduct and other unrelated criminal activity that poses the threat of additional punishment. The Court reasoned that "a defendant may have a legitimate fear of adverse consequences from further testimony . . . [and] any effort . . . to compel [that testimony] . . . at the sentencing hearing clearly would contravene the Fifth Amendment." *Id.* at 326 (quotation omitted).

It appears that under some of the teachings of *Mitchell*, the district court's statement swept too broadly to the extent it said that the Fifth Amendment was "gone" because Warren "ple[aded] guilty . . . [and] waived his right not to incriminate himself. . . ." App. at 52. However, that does not control the outcome of this case. What was left unsaid in *Mitchell* is as important as what was said. The Court specifically stated that it expressed no opinion on "whether silence bears upon the determination of . . . [a] downward adjustment provided in § 3E1.1 [— and logically § 5C2.1 —] of the United States Sentencing Guidelines. . . ." *Id.* at 330.[2]

## B.

The issue for decision here is one of first impression in

---

2. This specific statement in *Mitchell* dismantles Appellant's attempt to discredit the persuasive authority of *United States v. Arrington*, 73 F.3d 144 (7th Cir. 1996), *United States v. Washman*, 128 F.3d 1305 (9th Cir. 1997) and *United States v. Cruz*, 156 F.3d 366 (2d Cir. 1998) by observing that these Safety Valve cases pre-date *Mitchell*'s holding.

this court: whether a defendant may rely on the Fifth Amendment in refusing to disclose "all information and evidence . . . concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan. . . ." as required in U.S.S.G. § 5C1.2(a)(5). Warren acknowledges he has not fully disclosed, but nonetheless argues that his Fifth Amendment right against self-incrimination was violated by the district court's insistence that he come forth with the information requested by the government — most notably the identity of his coconspirators. He claims that full cooperation under the Safety Valve would have exposed him and his family to potential retribution and would have created the possibility of additional criminal liability.[3]

The Supreme Court has decided a string of so-called "penalty" cases that hold that the government may not impose a penalty on a person for asserting his or her Fifth Amendment privilege. *See Minnesota v. Murphy*, 465 U.S. 420, 434 (1984); *Lefkowitz v. Cunningham*, 431 U.S. 801,

---

3. Although Appellant's argument contemplates two separate rationales — fear of consequences and personal incrimination — we shall only address the latter. As to the first contention, the Court of Appeals for the Second Circuit has adequately addressed its merit in *United States v. Tang*, 214 F.3d 365 (2d Cir. 2000):

> The [Safety Valve] makes no exception for failure to furnish information because of feared consequences, yet it seems unlikely that Congress was unaware that those with knowledge of narcotics traffic would in some instances have legitimate apprehension about disclosing what they know. In other contexts, courts have refused to recognize fear of the consequences of disclosure as a lawful ground for withholding information that is required to be disclosed, *see Piemonte v. United States*, 367 U.S. 556, 559 n.2 (1961); *United States v. Winter*, 70 F.3d 655, 665-66 (1st Cir. 1995) (testimony required under grant of immunity), and no case has recognized such fear as a permissible basis for withholding information that renders a person eligible for a cooperation departure under U.S.S.G. § 5K1.1. The Sentencing Commission evidently contemplates that risk of injury to a defendant or his family will not excuse withholding information, because such a risk is explicitly identified as a factor to be considered in determining the extent of a cooperation departure. *See id.* § 5K1.1(a)(4). We see no basis for creating a fear-of-consequences exception to the safety valve provision.

804-808 (1977); *Lefkowitz v. Turley*, 414 U.S. 70, 77-84 (1973); *Sanitation Men v. Comm. of Sanitation*, 392 U.S. 280, 284-285 (1968); *Gardner v. Broderick*, 392 U.S. 273, 276-279 (1968) (all stating that sanctions such as loss of job, of state contracts, of future contracting privileges with the state, of political office, of the right to run for office and the revocation of probation are all impermissible "punishment" on the exercise of the privilege). To determine the Fifth Amendment implications of the Safety Valve statute and guideline we first decide whether the circumstances here come within the rubric of the jurisprudential concept of a "penalty."

## III.

*Mitchell* made clear that a court's decision to *increase* a sentence based upon the defendant's exercise of his or her Fifth Amendment privileges is an unconstitutional "penalty." 526 U.S. at 329. Although the treatment of a Safety Valve *decrease* is an open question in our court, several of our sister Courts of Appeals have held that denying a sentencing reduction under U.S.S.G. § 5C1.2 constitutes a "denied benefit" rather than a penalty and thus avoids Fifth Amendment implications. *See e.g. United States v. Arrington*; 73 F.3d 144, 149 (7th Cir. 1996) ("Requiring defendants to admit past criminal conduct in order to gain relief from statutory minimum sentence does not implicate the right against self-incrimination."); *United States v. Washman*, 128 F.3d 1305, 1307 (9th Cir. 1997) ("Section 3552(f) does not raise constitutional concern because it does not mete out additional punishment if a defendant decides not to disclose under § 3553(f)(5).") (emphasis in original); *United States v. Cruz*, 156 F.3d 366, 374 (2d Cir. 1998) ("[W]e hold that the choice confronting the defendant [with respect to § 5C1.2] gives rise to no more compulsion than that present in a typical plea bargain. We do not believe that this choice, unlike the choice in the penalty cases, is likely to exert such pressure upon an individual as to disable him from making a free and rational choice.").

We are persuaded that the reasoning in support of these decisions is also consistent with the intent of Congress in

enacting the Safety Valve provision. For example, in *Washman* the court recognized that the purpose of the provision was "to remedy an inequity in the Guidelines whereby more senior operatives could obtain lighter sentences than less culpable lower-level operatives because the former had more information to offer than the latter and so could benefit from the Substantial Assistance downward departure under U.S.S.G. § 5K1.1." 128 F.3d at 1307. The Safety Valve remedies this inequity by "allowing the sentencing court to disregard the statutory minimum in sentencing first-time nonviolent drug offenders who played a minor role in the offense and who have made a good-faith effort to cooperate with the government." *Id.* (quotation and citation removed). Then, too, in *Cruz* the court explained that, like plea bargaining, the "purpose of conditioning the safety valve benefit on truthful disclosure of relevant conduct was not to force defendants to waive their Fifth Amendment privilege, but to further another legitimate governmental goal." 156 F.3d at 375. And again in *Washman*, "The intent of Congress would be thwarted if defendants could obtain the benefit of the safety valve yet not disclose their true roles." 128 F.3d at 1307.

## IV.

In *United States v. Frierson*, 945 F.2d 650 (3d Cir. 1991), we tackled the self-incrimination problem involved in the "Acceptance of Responsibility" Sentencing Provision, U.S.S.G. § 3E1.1. Jerome Frierson pleaded guilty to one count of bank robbery by intimidation in violation of 18 U.S.C. § 2113(a). In exchange for his plea, the government dropped two separate charges of bank robbery with a dangerous weapon and interstate transportation of a stolen car. Frierson sought a two-point reduction under U.S.S.G. § 3E1.1. The district court denied the reduction, finding that Frierson withheld information while "selectively" accepting responsibility.

In his appeal, Frierson argued, as does Warren here, that he was unconstitutionally punished for his silence in violation of the Fifth Amendment. We affirmed, holding that the "reduction was denied on the basis of voluntary statements by Frierson in which he denied possessing a

gun[,]" not because "of any statements compelled pursuant to a threat against exercise of the [Fifth Amendment] privilege." *Frierson*, 945 F.2d at 664.

Notwithstanding the specific reasoning behind the affirmance in *Frierson*, Warren claims support in some of the language in the opinion. He places much emphasis on the opinion's concluding passage:

> We summarize our holdings:
>
> \*   \*   \*
>
> 3. For Fifth Amendment purposes, a denied reduction in sentence is equivalent to an increase in sentence; both are "penalties."

*Id.*

Two very important reasons militate against accepting Appellant's *Frierson* argument.

## A.

Simply labeling a statement in an opinion as a "holding" does not necessarily make it so. Gratuitous statements in an opinion that do not implicate the adjudicative facts of the case's specific holding do not have the bite of precedent. They bind neither coordinate nor inferior courts in the judicial hierarchy. They are classic *obiter dicta*: "statement[s] of law in the opinion which could not logically be a major premise of the selected facts of the decision."[4]

In examining the *ratio decidendi* in *Frierson*, we see the categorical deductive syllogism, albeit cloaked in enthymemes:

> Compelled statements are a threat against the Fifth Amendment.
>
> Frierson's statements were not compelled, but were voluntary.

---

4. RUPERT CROSS, PRECEDENT IN ENGLISH LAW 80 (2d ed. 1968) (citing EDWIN W. PATTERSON, JURISPRUDENCE: MEN AND IDEAS OF THE LAW 313 (1953)).

Therefore, they were not a threat against the Fifth Amendment.

Thus, the *Frierson* rationale did not rely on the gratuitous statement in the opinion, "a denied reduction in sentence is equivalent to an increase in sentence; both are 'penalties.' " This so-called "holding" was classic *obiter dicta*.[5]

## B.

The second, and more important reason against accepting Warren's *Frierson* argument, is that its "holding" statement has been totally eviscerated by our later consideration of the teachings of *Corbitt v. New Jersey*, 439 U.S. 212 (1978), which deemed constitutional a state murder statute providing the potential for a shorter sentence to defendants who pleaded *non vult*, or no contest. In so holding, the Court noted that "not every burden on the exercise of a constitutional right, and not every pressure or encouragement to waive such a right, is invalid. Specifically, there is no per se rule against encouraging guilty pleas." *Id.* at 218-219. Even though *Frierson* was decided after *Corbitt* — and presumably the panel considered its relevance — we later stated in *United States v. Cohen*, 171 F.3d 796, 805 (3d Cir. 1999), that, "[t]o the extent that *Corbitt* is in tension with [the so-called "holding"] . . . in *Frierson*, we must follow the Supreme Court. Sentencing Guideline 3E1.1 creates an . . . incentive for defendants to plead guilty, and under *Corbitt*, this incentive is constitutional."[6]

---

5.   It is not everything said by a judge when giving judgment that constitutes a precedent. In the first place, this status is reserved for his pronouncements on the law, and, . . . no disputed point of law is involved in the vast majority of cases that are tried in any year. . . .

The second reason . . . is that, among the propositions of law enunciated by him, only those which he appears to consider necessary for his decision are said to form part of the *ratio decidendi* and thus to amount to more than an *obiter dictum*. . . .

CROSS, *supra* note 4 at 35-40.

6. Appellant attempts to discredit this statement in *Cohen* by explaining that *Corbitt* only involves a Sixth Amendment claim, not a Fifth

For the foregoing reasons Appellant's reliance on *Frierson* is misplaced.

## V.

We therefore join our sister Courts of Appeals that characterize the Safety Valve a denied benefit rather than a penalty, although we focus more on the lack of true compulsion, rather than the benefit versus penalty dichotomy upon which other cases have dwelled. "The choice presented to a defendant under § 5C1.2 between a sentence reduction with relief from the mandatory minimum sentence and waiver of his [right to silence] is analogous to the choice confronting defendants in plea bargain cases." *Cruz*, 156 F.3d at 374. Contrary to Appellant's concern that he is "compelled to provide incriminating information to earn a reduction in his or her sentence, . . . the choice confronting the defendant gives rise to no more compulsion than that present in a typical plea bargain." *Id.* We believe that "this choice, unlike the choice in the [Supreme Court's] penalty cases, is not 'likely to exert such pressure upon an individual as to disable him from making a free and rational choice.' " *Id.* (quoting *Miranda v. Arizona*, 384 U.S. 436, 464-465 (1966)).

Accordingly, the Safety Valve provision furthers a legitimate government goal and does not impose an unconstitutional condition on defendants seeking its advantages.

\* \* \* \*

Warren voluntarily and intelligently accepted a plea bargain. In order to qualify for the sentencing benefits of

---

Amendment claim as both *Frierson* and the present case do. Presumably, Appellant borrows the language from the *Cohen* opinion stating that the murder statute in *Corbitt* "did not violate the defendant's Sixth Amendment right to trial." *Cohen*, 171 F.3d at 805. However, Appellant should have looked to the *Corbitt* opinion itself, which clearly states that the Fifth, Sixth and Fourteenth Amendments were considered on appeal: "Corbitt submi[ts] that the . . . [plea system] . . . is an unconstitutional burden on his federal rights under the Fifth, Sixth, and Fourteenth Amendments." *Corbitt*, 439 U.S. at 218.

the Safety Valve, U.S.S.G. § 5C1.2, he was required to disclose the names of the individuals involved in the same course of his criminal conduct. He failed to do so. The Safety Valve is not a right; it is a privilege. The Fifth Amendment is not implicated by a defendant's choice between seeking its benefits or embracing silence.

We will AFFIRM the judgment of the district court in all respects.

A True Copy:
Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*