

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-2-2008

# USA v. Green

Precedential or Non-Precedential: Precedential

Docket No. 06-2468

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Green" (2008). *2008 Decisions.* Paper 462.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/462

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 06-2468

———————

UNITED STATES OF AMERICA,

v.

ARTEGA GREEN,

Appellant

———————

On Appeal from the United States District Court
for the District of Delaware
(D.C. Criminal No. 04-cr-00105)
District Judge: Hon. Gregory M. Sleet

———————

Argued June 5, 2008

BEFORE: AMBRO, CHAGARES and COWEN, Circuit
Judges

(Filed: September 2, 2008)

Stephen P. Patrizio, Esq. (Argued)
1500 John F. Kennedy Boulevard, Suite 1205
Two Penn Center Plaza,
Philadelphia, PA 19102

Counsel for Appellant

Robert F. Kravetz, Esq. (Argued)
Office of the United States Attorney
1007 North Orange Street, Suite 700
P.O. Box 2046
Wilmington, DE 19899

Counsel for Appellee

OPINION

COWEN, Circuit Judge.

Defendant Artega Green was convicted by a jury of one count of distribution of more than 50 grams of cocaine base in violation of 21 U.S.C. § 841. The District Court sentenced him to a term of imprisonment of 151 months. Defendant timely appeals from both his conviction and sentence. For the reasons set forth below, we will vacate the judgment of conviction and remand for a new trial.

I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

2

Defendant's current conviction is premised upon a single controlled narcotics transaction which occurred on May 14, 2002. However, Green had apparently been a target of Drug Enforcement Agency ("DEA") investigative efforts since 2000, and was the subject of a number of other attempted controlled buys from 2000 to 2002. But the May 2002 transaction was the only one for which he was charged. DEA Special Agent David Hughes and Task Force Officer Lawrence Collins were the case agents; both were supervised by DEA Special Agent Eric Miller. The DEA's confidential informant ("CI"), Michael Brown, participated in the buy.

With regard to the May 2002 transaction, the Government's evidence against Green, as presented during its case-in-chief, consisted of: the testimonies of Special Agents (1) Hughes, and (2) Miller, (3) an audio recording in which the CI called a cell phone number "associated with" Green and ordered 3 ounces of cocaine base, and (4) a video[1] in which the CI allegedly engaged in a drug transaction with Defendant. The video was of relatively low quality, and only briefly depicted the profile of the alleged perpetrator; thus, key to the defense's case was to cast doubt as to whether Green was in fact the person depicted. Similarly, the audio recording consisted merely of a two-second phone call in which the recipient of the call (Green, allegedly) said "What's up dog, what's the deal?"

---

[1] The video was first introduced, not by the Government, but by defense counsel during his cross-examination of Special Agent Hughes. The parties subsequently agreed to introduce the video recording as a joint exhibit.

and agreed to the buy. The only evidence introduced by the Government in its case-in-chief directly connecting Defendant to both the audio and video was the testimony of the agents. Hughes testified he recognized Green's voice on the audio recording, Miller stated he recognized Green on the video and that he observed Green arrive at the location of the controlled buy and enter the premises with the CI (where the video surveillance took place). However, the CI involved in the transaction, Brown, testified for the defense at trial that the individual on the video was not Defendant.

## II. DISCUSSION

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have appellate jurisdiction to review the judgment and resulting sentence under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

On appeal, Defendant raises a number of issues: whether (1) the District Court erred by admitting Brown's prior written statement under the "present sense impression" hearsay exception; (2) the Government violated its Brady v. Maryland disclosure obligations; (3) the prosecutor engaged in misconduct in her summation by referring to Defendant's reactions after viewing of the video of the controlled buy; whether the District Court erred (4) in allowing jury to review transcripts of audio tape identifying Defendant by name; (5) in attributing additional drug quantities to Defendant at sentencing; and (6) in determining that the drug involved was crack cocaine. Because we conclude that the errors as to the admission of the CI's statement and of references to

4

Defendant's custodial responses warrant a new trial, we do not reach the remaining issues.[2]

A. Admission of Michael Brown's Statement

The crux of the Government's case was proving the identity of the individual captured on its audio and video evidence. It sought to do this exclusively through the testimonies of Agents Hughes and Miller. In a rather dramatic turn of events, however, Michael Brown, the CI involved in the controlled transaction, testified as the sole defense witness. According to Brown, Defendant never got out of the car on the

---

[2] Defendant devotes much of his attention to the Brady v. Maryland issue on appeal. The thrust of Green's complaint is that the Government's failure to disclose the extent of the DEA's prior encounters with him prejudiced his ability to effectively cross-examine Special Agents Hughes and Miller on the basis of their identifications of his voice and likeness. He claims the prejudice inuring from this omission is evident given the transactions that allegedly formed the basis of the agents' familiarity with him were ones for which the District Court rejected (upon a preponderance standard) as insufficiently attributable to Defendant to warrant recognition as relevant conduct at sentencing. We understand the argument. But because this issue was not formally raised and litigated below, we are thus unable to make the requisite materiality determination based on the record before us. See United States v. Bagley, 473 U.S. 667, 682-84 (1985) (relevant standard is reasonable probability of different outcome at trial had impeachment evidence been disclosed).

day of the buy, and the person depicted on the video selling the drugs was an individual known as "Tex." Brown also stated that the DEA agents had used him before in other controlled buys, always with the goal of catching Green on tape selling drugs; but they were never successful, and were upset at Brown because of this. He was extensively cross-examined by the Assistant United States Attorney ("AUSA"), who was allowed to elicit from Brown, without defense objection, that he had previously purchased drugs from Defendant on several occasions.

After Brown was excused from the witness stand, the prosecution called Special Agent Miller as a rebuttal witness. Through Miller, and over Defendant's vigorous objection, the Government was permitted to introduce as substantive evidence a statement that Brown purportedly made some 50 minutes following the controlled buy in question, after he was brought back to DEA offices and debriefed by the case agents. In it, Brown attested that it was Green who sold him the drugs. The statement was signed by Brown, and was witnessed and signed by the agents as well. Although the defense argued that the statement should not have been admitted under Federal Rule of Evidence 613(b) because Brown had not been given the opportunity to explain or deny it on the stand, the District Court admitted the statement, pursuant to the prosecution's argument, as a present-sense impression under Rule 803(1). No limiting instruction was given.

We generally review a trial court's decision to admit or exclude evidence for abuse of discretion. United States v. Sokolow, 91 F.3d 396, 402 (3d Cir. 1996). But where the evidentiary determination is premised upon an interpretation of

6

the federal rules, our review is plenary. Id. Here, we conclude the District Court's evidentiary ruling was in error.

Federal Rule of Evidence 803(1) renders admissible as a present-sense impression "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." A hearsay statement may be admitted under this exception if it explains or describes an event personally witnessed by the declarant, and if the declaration is made essentially contemporaneous to witnessing the event. United States v. Mitchell, 145 F.3d 572, 576 (3d Cir. 1998); 5 Jack B. Weinstein and Margaret A. Berger, WEINSTEIN'S FEDERAL EVIDENCE § 803.03[1] (2d ed. 1997). In this case, there is no dispute that Brown was personally present at the narcotics transaction and that his statement purports to recount the details of that transaction. The only question before us is whether the statement is sufficiently contemporaneous to qualify as a present-sense impression.

The fundamental premise behind this hearsay exception "is that substantial contemporaneity of event and statement minimizes unreliability due to [the declarant's] defective recollection or conscious fabrication." United States v. Manfre, 368 F.3d 832, 840 (8th Cir. 2004) (quoting United States v. Blakey, 607 F.2d 779, 785 (7th Cir. 1979)); 5 WEINSTEIN'S FEDERAL EVIDENCE § 803.03[1]; see Miller v. Keating, 754 F.2d 507, 512 (3d Cir. 1985) (lack of time to deliberately manipulate truth of account is key). "The idea of immediacy lies at the heart of the exception," thus, the time requirement underlying the exception "is strict because it is *the* factor that assures trustworthiness." 4 Christopher B. Mueller and Laird C. Kirkpatrick, FEDERAL EVIDENCE § 8:67, 559, 562 (3d ed. 2007);

7

see also Chambers v. Mississippi, 410 U.S. 284, 298-99 (1973) (hearsay exceptions are premised on the idea that the particular circumstances surrounding the making of certain utterances guarantee their reliability).  Put differently, the temporality requirement must be rigorous because the passage of time – or the lack thereof – is the effective proxy for the reliability of the substance of the declaration; hence the greater the passage of time, the less truthworthy the statement is presumed to be, and the more the scales should tip toward inadmissibility.  Manfre, 368 F.3d at 840 ("The opportunity for strategic modification undercuts the reliability that spontaneity insures."). Nevertheless, some brief temporal lapse is permissible so as to accommodate "the human realities that the condition or event may happen so fast that the words do not quite keep pace."  4 FEDERAL EVIDENCE § 8:67, at 562; Fed. R. Evid. 803(1) Adv. Comm. Notes (1975) ("[w]ith respect to the time element, [803(1)] recognizes that in many, if not most, instances precise contemporaneity is not possible and hence a slight lapse is allowable").

While it is true, as the Government notes, that courts have not adopted any bright-line rule as to when a lapse of time becomes too lengthy to preclude Rule 803(1)'s application, see Blakey, 607 F.2d at 785 (no *per se* rule exists), we are nevertheless unaware of any legal authority for the proposition that 50 minutes after the fact[3] may appropriately be considered

---

[3] Here, the prearranged controlled transaction concluded at approximately 2:55pm, and the statement was made at 3:45pm. App. at 507A.

8

"immediately thereafter." On the contrary, given the clear language of the rule and its underlying rationale, courts consistently require substantial contemporaneity. See, e.g., United States v. Shoup, 476 F.3d 38, 42 (1st Cir. 2007) (911 phone call made "only one or two minutes ... immediately following" event admissible); United States v. Danford, 435 F.3d 682, 687 (7th Cir. 2006) (statement made "less than 60 seconds" after witnessing robbery qualified as present-sense impression); United States v. Jackson, 124 F.3d 607, 618 (4th Cir. 1997) (statement by witness to police upon their arrival at scene that defendant was threatening to kill her family was admissible as "description of ongoing events"); Blakey, 607 F.2d 779, 785-86 (not error to admit statement made at most 23 minutes after event[4]); cf. Manfre, 368 F.3d at 840 (statement made after "an intervening walk or drive" following event not

---

[4] The precise timing of the statement at issue in United States v. Blakey (in which an extortion victim described an instance of defendants' threats) was unclear. 607 F.2d 779, 785 (7th Cir. 1979). The chronology there was as follows: the defendants left the victim's store at 6:00pm after threatening him, and a phone call was made at 6:23pm. In the interim, the victim was recorded having a lengthy conversation with another individual, during which he made the statement sought to be admitted. Id. at 785-86. There, the court found that "a relatively large amount of conversation" was recorded *after* the statement at issue. Id. at 786. Thus, the Seventh Circuit concluded that although the only outer temporal demarcation available was 23 minutes, the statement at issue was nevertheless likely made well within the 23-minute span. Id.

9

admissible; "The present-sense-impression exception ... is rightfully limited to statements made while a declarant perceives an event or immediately thereafter, and we decline to expand it to cover a declarant's relatively recent memories."); Hilyer v. Howat Concrete Co., Inc., 578 F.2d 422, 426 n.7 (D.C. Cir. 1977) (excluding statement made between 15 and 45 minutes following event). Indeed, we have previously expressed skepticism that a statement made some 40 minutes after the fact could be properly admitted as a present-sense impression. Mitchell, 145 F.3d at 577 (where robbery occurred between 9:00am and 9:15am and notes were found in getaway car a mile from the crime scene at approximately 10:00am, intervening lapse was "probably too long for applicability of the present-sense impression ... which requires the statement to be made virtually contemporaneously with the event being perceived"); see also Miller, 754 F.2d at 512 (concluding it was "not necessarily an abuse of discretion" to admit statement made "several minutes" after the fact as excited utterance, but noting "courts have recognized that the length of time separating the event from the statement [for admission as an excited utterance] *may be considerably longer* than for statements qualifying under the present sense impression exception of Rule 803(1)") (emphasis added).

Here, we need not decide the precise temporal limits of application of the present-sense impression exception, nor whether a statement made 50 minutes after the fact could ever be properly admitted under Rule 803(1). This is so since Brown's statement in this case is problematic not only because of the lengthy passage of time, but also because the statement was only made *after he had been questioned by DEA agents*

10

about the details of the transaction the statement purports to describe. This undisputed sequence of events affirmatively indicates that Brown made his statement after he was expressly asked to reflect upon the events in question, and thereby fatally disqualifies the declaration for admission as a present-sense impression. See, e.g., 4 FEDERAL EVIDENCE § 8:67, at 564 (statements made after "significant delays – those measured in minutes or hours, *especially if the speaker has made other statements in the interim* – bar resort to [Rule] 803(1)") (emphasis added); United States v. Narciso, 446 F. Supp. 252, 287-88 (E.D. Mich. 1977) (note written two hours after event and in response to questions not present-sense impression because declarant "not only had time to reflect on what had transpired [but] was intentionally encouraged to reflect on those events before answering"). Admitting Brown's statement under these circumstances would directly undermine the fundamental premise behind the present-sense impression exception – that contemporaneity ensures reliability because there is no time for deliberate fabrication. E.g., 4 FEDERAL EVIDENCE § 8:67, at 564 ("time for reflection [] lessen[s] or removes[s] the assurance of trustworthiness"); 5 WEINSTEIN'S FEDERAL EVIDENCE § 803.03[1] (substantial contemporaneity required as to allow "little or no time for calculated misstatement"). In short, the weight of the authorities makes plain that Brown's statement – made 50 minutes after perceiving the transaction, after he was searched and driven to DEA offices, and after he was debriefed by law enforcement – was not properly admitted as a present-sense impression.

Nor does Special Agent Miller's testimony corroborating the substance of Brown's description of the transaction

11

otherwise render the statement admissible under Rule 803(1). We have indicated that courts may, in certain cases, require substantiation or other indicia of trustworthiness *in addition* to contemporaneity before admitting the declaration as a present-sense impression. <u>See</u> <u>In re Japanese Elec. Prods. Antitrust Litig.</u>, 723 F.2d 238, 303 (3d Cir. 1983), <u>rev'd on other grounds</u>, 475 U.S. 574 (1986) (declining to admit statements "solely on the basis of contemporaneity" because there was otherwise "reason to be skeptical" of their substance). However, we are aware of no authority that a statement which does not independently satisfy a hearsay exception's prerequisites may nevertheless be admitted based solely upon corroboration of its contents. Such a proposition would obviously render much of the actual text of the hearsay rules completely superfluous.[5]

---

[5] Furthermore, although not necessary to our decision, we observe that the admission of Brown's statement may also have been improper under Federal Rule of Evidence 613(b), as was argued by Defendant below. Fed. R. Evid. 613(b) ("Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."). Under the circumstances, the prosecution was entitled to question Brown about his prior written statement during cross-examination, <u>see</u> Fed. R. Evid. 613(a) (may inquire about prior statement for impeachment purposes), but the rule is explicit that in order to "prove up" the content of the inconsistent statement, Brown must be confronted with it. <u>E.g.</u>, 4 Jack B. Weinstein and Margaret A. Berger,

12

Our conclusion that the admission of Brown's prior statement was error warrants reversal unless the error was harmless. Lippay v. Christos, 996 F.2d 1490, 1500 (3d Cir. 1993). To determine harmlessness, we must decide whether it was highly probable that the evidentiary error substantially influenced the jury's verdict. Gov't of Virgin Islands v. Toto, 529 F.2d 278, 283 (3d Cir. 1976). Here, notwithstanding the Government's conclusory assertions to the contrary, the evidence against Defendant, outside of Brown's statement, was not overwhelming. While Special Agent Miller testified he

WEINSTEIN'S FEDERAL EVIDENCE § 613.05[1] (2d ed. 1997) (extrinsic evidence of prior statement should be excluded if Rule 613(b) requirements are not satisfied); United States v. Liefer, 778 F.2d 1236, 1250 (7th Cir. 1985) (trial court correctly sustained objection to admission of prior statement when government did not confront witness with it). However, here the Government did not ask Brown about his statement while he was on the stand, did not recall him after the statement was introduced through the rebuttal witness (nor was any *attempt* to do so evident on the record) for its substantive content, and the District Court made no determination that the statement's admission was otherwise warranted in "the interests of justice." Fed. R. Evid. 613(b); 4 WEINSTEIN'S FEDERAL EVIDENCE § 613.02[2][a] (need for full opportunity to explain prior statement is particularly strong where inconsistent statement may be admitted as *substantive* evidence); see also id. § 613.05[4][a] ("interest of justice" exception may be invoked if, *inter alia*, witness was not present to be recalled to be questioned about prior statement).

13

recognized Defendant as the individual briefly (and partially) depicted on the videotape, the informant himself – the only person who was actually physically present for the transaction – testified to the contrary. Given this conflicting testimony, the import of Brown's prior statement in which he contradicts his trial testimony is self-evident, and the resulting prejudice to Defendant is plain. Under the circumstances, we cannot help but harbor a "grave doubt" that the erroneous admission of the written statement here substantially influenced the jury's verdict. Toto, 529 F.2d at 283 (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)); see Lippay, 996 F.2d at 1500 (new trial warranted where evidence pertaining to key issue in case was improperly admitted). Accordingly, we must vacate the conviction and remand for a new trial.

B.Defendant's Responses and Statements

Next, we also consider whether the Government's references to Defendant's custodial responses and statements violated his constitutional rights. In particular, at issue is the prosecutor's questions and statements pertaining to the fact that after being placed under arrest and while in DEA custody, and after being shown a videotape which supposedly depicted him selling drugs, Defendant widened his eyes, asked for the video to be replayed, and then sighed and hung his head.[6]

_____

[6] At the outset, we acknowledge that on appeal Defendant frames this claim as one of prosecutorial misconduct based on an alleged violation of his post-arrest, post-Miranda right to silence, and only expressly objects to the prosecutor's references as they were made in her closing arguments. However, even a

14

As no objections were made below, we may only review for plain error. Fed. R. Crim. Proc. 52(b). The plain error doctrine allows courts to correct an otherwise forfeited error where the mistake is obvious and so prejudicially impacted the outcome at trial such that it arises to a fundamental miscarriage of justice. United States v. Warren, 338 F.3d 258, 260 (3d Cir. 2003); see also United States v. Olano, 507 U.S. 725, 732 (1993). Notwithstanding this demanding standard of review, where, as here, the errors are manifest in light of decades of well-settled Fifth Amendment and due process jurisprudence and were not harmless beyond a reasonable doubt, we require no further briefing to conclude that Defendant's conviction must be vacated on these grounds as well. See United States v. Shaw, 701 F.2d 367, 382 n.9 (5th Cir. 1983) (comment on defendant's invocation of right to remain silent may arise to plain error); United States v. Whitehead, 200 F.3d 634, 639 (9th Cir. 2000) (admission of evidence of defendant's post-arrest, pre-Miranda silence "plainly infringed upon [defendant's] privilege against self-incrimination" and warrants reversal as long as error affected outcome of proceeding).

We begin with a brief recitation of the circumstances surrounding Defendant's prosecution. The narcotics transaction

---

cursory review of the trial record makes clear that the constitutional violations effected here extend well beyond the confines of Doyle v. Ohio, 426 U.S. 610 (1976), and that the Government's comments on Defendant's reactions were not limited to its summation, but rather were made during its case-in-chief as well as in its opening statements.

for which Green was convicted occurred in May 2002, and the Government obtained a federal indictment against Defendant for this act in September 2004. On December 2, 2004, Green was arrested by DEA Special Agents Miller and Hughes. While in custody, Defendant admitted that he had sold narcotics in the instance depicted on the videotape that he was shown (purportedly of the May 2002 transaction). Prior to trial, Green sought to suppress his confession, claiming that he did not waive his Miranda rights, but the District Court denied the motion.

At the suppression hearing, Special Agent Hughes testified that prior to heading out to the field to arrest Green on December 2, 2004, he did an outstanding warrants check and found that Green had an active *capias* for an unrelated state court matter.[7] Based on this, when Hughes arrested Green, he purposefully did not identify himself as DEA, but merely said that he was "police" and that Green was being arrested for the state *capias*. Only after Green was transported to DEA offices did Hughes inform him of the true nature of the arrest – that he had been indicted by a federal grand jury for distribution of narcotics. Then, after holding Green in a cell for a brief period, Hughes took him into an interrogation room, showed him the video, advised Green of his Miranda warnings, and then began

_____

[7] However, Defendant presented undisputed evidence at the hearing that this *capias* had in fact been withdrawn as of December 1, 2004, the day prior to Green's arrest. But there was no indication as to when this information was updated in the police database.

16

express questioning.  Green subsequently waived his rights and confessed, although no waiver form was signed.

Remarkably, the failure to administer <u>Miranda</u> warnings prior to showing Green the video was the result of a conscious decision on the part of the DEA.  As Hughes explained:

> [I]t was my intention to get Mr. Green back to our office, show him the video, and attempt to gain his cooperation so I could identify the source of supply ... And, quite frankly, had I said, you know, I was DEA Special Agent Hughes and had him out on the scene, it's quite possible he would have said, I want to speak to my lawyer right away.

App. at 59A-60A (transcript from suppression hearing). Indeed, Hughes candidly stated that the withholding of <u>Miranda</u> was his plan all along.  App. at 63A-64A ("Q:  Is there a reason why when you were arresting [Green] that day ... on the street, when you approached him, why you didn't advise him of his Miranda rights at that time?  [Hughes]: I chose not to ... Q: Purposely?  A: Purposely ... The [] plan was not to *Mirandize* Artega Green until he saw the video."); <u>id.</u> at 60A ("So, yes, [not giving the warnings until after the video] was a strategy and a plan that I intended on utilizing upon making that arrest.").[8]

---

[8]  There is also a suggestion in the record that this was done because DEA agents had Green in custody on previous occasions but were unable to extract any statements from him.

Defendant did not testify in his own defense at trial. However, during the Government's case-in-chief, the AUSA was permitted to elicit from Hughes testimony as to Green's reactions and statements after viewing the video. In particular, in response to the AUSA's questions, Hughes stated:

> [W]hen the defendant first viewed the video ... he looked at it, and the defendant's eyes kind of widened. He looked surprised. And the next statement was, can he see it again. And I rewound it. Hit play again. Allowed the defendant to see the video again ... At the conclusion of the video, the defendant kind of lowered his head, took like a sigh, a deep breath.

---

In particular, as the prosecutor argued to the District Court at suppression:

> I think the most telling evidence [that Defendant voluntarily waived his Miranda rights]... is the testimony of Agent Hughes about prior contact by one of the officers participating in this case, in the Mirandizing of the defendant as well as the officer, Task Force Officer Lawrence Collins, who had prior law enforcement contact with the defendant in a drug investigation, *Mirandized*, or was present when the defendant was *Mirandized*. And the defendant, being savvy and knowing the criminal justice system, invoked those rights.

App. at 87A.

18

App. at 272A.  During her closing, the AUSA argued that Green's reactions clearly demonstrated his admission of guilt:

> [Y]ou heard Agent Hughes' testimony when he sat the defendant down and said I want to show you something.  When he played the video ... of the actual drug transaction, what did the defendant do?  Well, Agent Hughes told you.  His eyes opened wide as if he were surprised.  Might you have been surprised if you were being confronted with crack cocaine you sold two and a half years ago?  ... And what was the defendant's reaction after his eyes opened wide?  He asked to see the video again.  Now, if you are not the person who was caught on the video, why would you want to see the video again?  Why would you look surprised?    And more importantly, ladies and gentlemen, why would you do what Agent Hughes told you the defendant did after he saw it the second time?  Why would you sit and lower your head (indicating)?  Why, if you didn't do it?  Who cares?
>
> ...
>
> Ask yourself, ladies and gentlemen, if you are in a DEA office and you are being told about all these terrible things that could happen to you and you are being confronted by a federal prosecutor and you have seen this videotape of somebody who looks just like you selling crack cocaine to

19

another individual, but you are innocent, what might you say? Would you shake your head and look surprised ... Or would you say, I didn't do it?

App. at 555A-556A, 557A. No objection was lodged as to any of these references.

Notwithstanding the failure to object, the error in allowing these questions and comments plainly rises to that of a constitutional magnitude. Here, the issues before us are whether the prosecution may use in its case-in-chief as substantive evidence[9] (1) Green's responses and reactions upon seeing the video before being advised of his Miranda rights and (2) the statements he made subsequent to being advised of his Miranda rights. Under the circumstances present in this case, we conclude that it may not.

## 1. Responses after viewing video

It is hornbook law that the police must advise a suspect of his Fifth Amendment right to remain silent before initiating a custodial interrogation. Miranda v. Arizona, 384 U.S. 436 (1966). Miranda's protections "come into play whenever a

---

[9] As a threshold matter, we note that because Defendant did not testify, there is no issue before us pertaining to whether any such evidence may be properly used for impeachment purposes. See Jenkins v. Anderson, 447 U.S. 231, 240 (1980) (prosecution may use defendant's pre-arrest, pre-custodial silence for impeachment purposes); but cf. Doyle v. Ohio, 426 U.S. 610, 611 (1976) (impeachment use of defendant's post-Miranda silence violates due process).

20

person in custody is subjected to either express questioning or its functional equivalent," that is, "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). Any statements or testimonial acts made prior to the administration and voluntary waiver of Miranda rights are "irrebuttably presumed involuntary" and may not be used in the prosecution's case-in-chief. United States v. Pacheco-Lopez, 531 F.3d 420, 424 (6th Cir. 2008) (quoting Oregon v. Elstad, 470 U.S. 298, 307 (1985)); Missouri v. Seibert, 542 U.S. 600, 608 (2004) (plurality opinion).[10] An act is "testimonial" if it "explicitly or implicitly, relate a factual assertion or disclose information." Doe v. United States, 487 U.S. 201, 210 (1988); Pennsylvania v. Muniz, 496 U.S. 582, 589 (1990); cf. Schmerber v. California, 384 U.S. 757, 761 (1966) (physical evidence does not implicate Fifth Amendment).

As even the Government acknowledged during oral argument, Green was in custody for purposes of Miranda when he was shown the videotape. And we can hardly imagine a more prototypical example of the "functional equivalent" of

---

[10] Although the Supreme Court has recognized a few limited exceptions to this general rule of inadmissibility, see New York v. Quarles, 467 U.S. 649, 655-56 (1984) (public safety exception); Harris v. New York, 401 U.S. 222, 226 (1971) (impeachment exception where defendant testifies), none are implicated here.

21

interrogation than when a suspect is shown a video in which he is depicted as engaging in a criminal act. In this case, not only was Hughes's action one which he should have known was "reasonably likely to elicit an incriminating response," Innis, 446 U.S. at 301; indeed, as was openly admitted, Hughes showed the video *with the express design* that Green would respond by incriminating himself, App. at 59A-60A. Thus, it is clear that Green's Miranda rights were implicated at the point he was shown the video.

Furthermore, in the particular context of this trial, Hughes' testimony about Green's non-verbal reactions upon viewing the video – that Green widened his eyes, lowered his head and sighed – was plainly elicited by the Government with the intent of arguing to the jury that these acts demonstrated Green's acknowledgment of guilt. And as the portions of the trial transcript excerpted above make clear, the AUSA did exactly this in her closing. Under these circumstances, we need not decide whether a defendant's acts in lowering his head and sighing or opening his eyes wide are necessarily testimonial for purposes of the Fifth Amendment in every instance. See United States v. Rivera, 944 F.2d 1563, 1569 (11th Cir. 1991) (noting in dicta the "difficult levels of gradation" between non-verbal communicative acts and "purely physical" non-assertive reactions). It is enough that the Government clearly presented them as such to the jury in this case. See United States v. Elkins, 774 F.2d 530, 538 (1st Cir. 1985) (acknowledging that while defendant did not seem surprised by arrest or questioning "may arguably [be] evidence of [] demeanor," where it was nevertheless clear that the description of defendant's reaction was unambiguously used at trial in a manner that "invited the

22

jury to infer guilty knowledge from the [] failure to respond, admission was error); see also Rivera, 944 F.2d at 1568-69 (dicta that government's comment about defendant's "deadpan" expression during custodial interrogation upon observing discovery of contraband in her luggage may be "constitutionally problematic," but declining to decide issue because error, if any, was harmless). Here, because the DEA agents did not administer the requisite warnings prior to showing Green the video, the admission at trial of Green's statements – both verbal and non-verbal – made after seeing the video was error. Elstad, 470 U.S. at 317.[11]

We emphasize that the most critical aspect of this case is that Green's reactions here came after he was unquestionably in custody and was subjected to the functional equivalent of interrogation. In the context of our Fifth Amendment and due process jurisprudence, the terms pre- and post-Miranda are merely shorthand for the crucial inquiry of whether one's Miranda rights have been implicated. Indeed, that police fail to administer warnings when they were constitutionally required to

---

[11] We note that the inadmissibility of such statements is generally an issue that is readily conceded by the prosecution. See, e.g., United States v. Naranjo, 426 F.3d 221, 226 (3d Cir. 2005) (government agreed defendant's pre-Miranda statements could not be used at trial so only issue before court was admissibility of post-Miranda statements); United States v. Yamba, 407 F. Supp. 2d 703, 719 n.1 (W.D. Pa. 2006) ("The United States conceded that the statement Yamba made before he was *Mirandized* must be suppressed.").

23

do so obviously does not mean that subsequent statements (or silence) are "pre-Miranda" for purposes of trial admissibility. Otherwise, police could render all statements (and silence) admissible simply by withholding the requisite warnings until after the fact and thus circumvent Miranda entirely. See United States v. Moore, 104 F.3d 377, 386, 385 (D.C. Cir. 1997) (no case could logically "stand[] for the proposition ... that the defendant's silence can be used against him so long as he has not received his Miranda warnings"; concluding to the contrary "would create an incentive for arresting officers to delay interrogation in order to create an intervening 'silence' that could then be used against the defendant"). As such, although Defendant's statements in this case were technically and chronologically pre-Miranda – that is, occurring before Defendant was advised of his Miranda rights – they were not truly of the pre-Miranda variety for purposes of the relevant constitutional analysis since they in fact occurred after Miranda's safeguards were triggered and after the warnings should have been given. Therefore, nothing more than a straightforward application of Miranda is required in the case before us; because Defendant's reactions were impermissibly compelled, their admission at trial violated due process. Miranda, 384 U.S. at 444 ("the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination").

Moreover, we observe that the record before us also amply supports the conclusion that the prosecutor commented on Green's silence or non-responsiveness through reference to

24

his non-verbal reactions. App. at 557A (Government's closing: "[I]f you are in a DEA office ... and you are being confronted by a federal prosecutor and you have seen this videotape of somebody who looks just like you selling crack cocaine ... but you are innocent, what might you say? *Would you shake your head and look surprised ... Or would you say, I didn't do it?*") (emphasis added). It may be that this use was also constitutionally questionable in light of the well-settled rule that once Miranda rights have attached, the prosecutor may not ask the jury to draw the inference that the defendant's subsequent silence is inconsistent with his innocence. E.g., Griffin v. California, 380 U.S. 609, 614-15 (1965); cf. Fletcher v. Weir, 455 U.S. 603, 606-07 (1982) (not fundamentally unfair to use defendant's silence *for impeachment purposes* where government did not expressly induce his silence by advising of Miranda rights). However, because we premise our decision here on the basis that Green's non-verbal acts were testimonial and communicative in nature, we do not reach the distinct, but somewhat thorny question of whether the prosecutor's references to Defendant's technically pre-Miranda non-responsiveness may separately arise to constitutional error.[12]

---

[12] The issue of whether a defendant's pre-Miranda silence may be used as substantive evidence of guilt in the prosecution's case-in-chief has divided the circuits. The majority hold that such use is *not* constitutionally permissible. See, e.g., United States v. Elkins, 774 F.2d 530, 538 (1st Cir. 1985) (testimony regarding defendant's apparent lack of surprise when arrested and given Miranda warnings violated due process); Combs v. Coyle, 205 F.3d 269, 283 (6th Cir. 2000) ("use of a defendant's

25

prearrest silence as substantive evidence of guilt violates the Fifth Amendment"); United States ex rel. Savory v. Lane, 832 F.2d 1011, 1018 (7th Cir. 1987) (same); United States v. Velarde-Gomez, 269 F.3d 1023, 1033 (9th Cir. 2001) (en banc) (district court erred in allowing government to comment on defendant's post-arrest, pre-Miranda silence); United States v. Burson, 952 F.2d 1196, 1200-01 (10th Cir. 1991) (admission into evidence of defendant's pre-arrest, pre-Miranda refusal to answer questions constituted plain error); United States v. Moore, 104 F.3d 377, 385 (D.C. Cir. 1997) ("custody and not interrogation is the triggering mechanism for the right of pretrial silence under Miranda"; government's comment on post-arrest, pre-Miranda silence was error); see also United States v. Caro, 637 F.2d 869, 876 (2d Cir. 1981) (noting in dicta "we have found no decision permitting the use of silence, even the silence of a suspect who has been given no Miranda warnings and is entitled to none, as part of the Government's direct case"). But cf. United States v. Love, 767 F.2d 1052, 1063 (4th Cir. 1985) (testimony of defendants' *pre-arrest*, pre-Miranda silence properly admitted; no fundamental unfairness in admitting evidence of non-Miranda-induced silence); United States v. Frazier, 408 F.3d 1102, 1111 (8th Cir. 2005) (comment on defendant's post-arrest, pre-Miranda silence permissible as substantive government evidence where defendant was under no official compulsion to speak); United States v. Rivera, 944 F.2d 1563, 1568 (11th Cir. 1991) (dicta that government may reference defendant's post-arrest, pre-Miranda silence without raising constitutional questions). See also United States v. Pando Franco, 503 F.3d 389, 396 (5th Cir. 2007) (noting circuit

26

2 . <u>Subsequent confession</u>

Given our conclusions that the showing of the video was the functional equivalent of interrogation, and that the failure to advise Green of his rights violated <u>Miranda</u>, we are thus left with the on-the-record statement by DEA Special Agent Hughes that this omission was the result of a deliberate and calculated plan. Although Defendant fails to raise this issue, we are unable to ignore the implication that this stark admission on the part of a federal law enforcement official has on the admissibility of Defendant's subsequent, post-<u>Miranda</u> statements. <u>See</u> <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004). This is precisely the type of error contemplated by the "plain error" standard of review. <u>Warren</u>, 338 F.3d at 260 (unpreserved error which affected the outcome of trial proceedings may be corrected on appeal where it "seriously affects the fairness, integrity, or public reputation of judicial proceedings"); <u>see also</u> <u>United States v. Stewart</u>, 388 F.3d 1079, 1091 (7th Cir. 2004) (remanding to district court for <u>Seibert</u> determination but stating if <u>Seibert</u> rendered confession inadmissible, earlier admission of confession was plain error affecting defendant's substantial rights).

In <u>Seibert</u>, the Supreme Court considered the constitutionality of the "question first, *Mirandize* later" interrogation strategy. There, the Court held that where police make a conscious decision to withhold <u>Miranda</u> until after interrogating and obtaining a confession, all subsequent incriminating statements, even those made after the mid-interrogation provision of <u>Miranda</u> warnings are rendered

split but declining to resolve question).

27

inadmissible. <u>Seibert</u>, 542 U.S. at 616-17; <u>cf.</u> <u>Oregon v. Elstad</u>, 470 U.S. 298, 311-14 (1985) (although defendant made unsolicited confession at scene, police's later <u>Miranda</u> warnings given when defendant was formally in custody made subsequent, repeated confession admissible under objective inquiry of voluntariness).

We have previously discussed the <u>Seibert</u> decision at length in <u>United States v. Naranjo</u>, 426 F.3d 221 (3d Cir. 2005). In <u>Naranjo</u>, federal customs agents suspected that the defendant was involved in narcotics trafficking, and a few days into their investigation, a number of agents converged on the suspect as he was leaving his residence. <u>Id.</u> at 224. Naranjo was handcuffed, but the agents told him that although he was not under arrest and did not have to answer any questions, they wanted to know if he would be willing to speak with them in any event. <u>Id.</u> at 224-25. Defendant agreed to talk and incriminated himself. <u>Id.</u> at 255. After a break in the questioning, however, notwithstanding the defendant's desire to continue speaking, the agents stopped him and advised him of his <u>Miranda</u> rights; Naranjo subsequently waived his rights and offered additional details of his criminal involvement. <u>Id.</u>

We held in <u>Naranjo</u> that the threshold inquiry, when confronted with a statement challenged on "question first, *Mirandize* later" grounds, is whether the timing of the <u>Miranda</u> warning was the product of a deliberate law enforcement tactic to withhold the requisite warnings at the commencement of questioning. <u>Id.</u> at 231-32 (citing <u>Seibert</u>, 542 U.S. at 622

28

(Kennedy, J., concurring in judgment)).[13]  Where <u>Miranda</u> is consciously withheld, "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made."  <u>Seibert</u>, 542 U.S. at 622 (Kennedy, J., concurring).  Such "curative measures" may "include an inquiry into whether or not the defendant was informed that his/her prior unwarned statement can not be used as evidence, although it's not necessary to inform the suspect of that in every instance."  <u>Naranjo</u>, 426 F.3d at 232.  Further, "a substantial break in time and circumstances between the prewarning statement and the <u>Miranda</u> warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn."  <u>Seibert</u>, 542 U.S. at 622 (Kennedy, J., concurring).  In determining the efficacy of the midstream warnings (<u>i.e.</u>, whether the belated advisement sufficiently "cured" the taint of the initial <u>Miranda</u> violation), courts may also consider the degree of overlap between the substance of pre-warning and post-warning statements and questions, whether the same interrogators were involved, the level of detail of the pre-warning statements, and the extent to which interrogators treated the post-warning questioning as a continuation of the pre-warning session.  <u>Id.</u> at 615 (plurality opinion); <u>see</u> <u>Stewart</u>, 388 F.3d 1090 (if two-step interrogation

---

[13]  As we noted in <u>Naranjo</u>, because Justice Kennedy's concurrence is narrower than the plurality's opinion, his reasoning is properly viewed as the holding of the Court.  426 F.3d at 231 (quoting <u>Marks v. United States</u>, 430 U.S. 188, 193 (1977)).

29

strategy is intentionally undertaken, "the central voluntariness inquiry of Elstad has been replaced by a presumptive rule of exclusion, subject to a multifactor test for change in time, place, and circumstances from the first statement to the second"). Because it was unclear based on the record available to the Naranjo court whether the Miranda warnings there were omitted as a result of a "rookie mistake" or a deliberate interrogation strategy, we remanded the case to the district court to make the requisite Seibert findings. Naranjo, 426 F.3d at 232. No such ambiguity exists in this case.

Here, DEA Special Agent Eric Hughes and Task Force Officer Lawrence Collins arrested Defendant on the street pursuant to a federal drug indictment but told him initially that it was for a state warrant. This was done, at least in part, to prevent Green from invoking his rights at the outset. App. at 59A ("And, quite frankly, had I said [] I was DEA ... and had him out on the scene, it's quite possible he would have said, I want to speak to my lawyer right away."). After arriving at DEA offices, Defendant was taken to an interrogation room by Hughes and Collins and only then was informed of the true nature of his arrest. Hughes told Green "not to say anything further," at which point the video was played. After seeing the video, Green made a number of verbal and non-verbal statements which acknowledged his guilt.

Hughes then immediately administered the Miranda warnings, and Green allegedly waived his rights, although no waiver form was signed. Hughes asked Green if he recognized anyone on the video. After a long pause, Defendant shook his head and said that he was "smoking a lot of weed back then and just didn't remember." Hughes reminded Green of the evidence

30

they had against him, the severity of the charges, and repeated the question. Defendant again gave the same response that he did not recall. Hughes and Collins thus suspended the questioning, moved Defendant back to a holding cell, and sought the assistance of the AUSA assigned to the case. After the prosecutor arrived at DEA offices approximately an hour and 20 minutes later, Green was again taken to an interview room and Hughes and Collins, this time accompanied by the AUSA, resumed questioning. After all three government officials emphasized the potential criminal penalties he was facing, Defendant responded: "What do you want to know?" Collins then asked Green if he had ever sold crack cocaine; Green responded that he had done so only once, and gestured toward the video. Defendant then told the agents the identity of his drug source for the particular transaction.

Because Hughes openly stated at the suppression hearing that he intentionally refrained from advising Green of his Miranda rights prior to showing the video, Seibert dictates that Green's post-Miranda statements which relate to his pre-Miranda admissions are presumptively inadmissible unless we determine that the second interrogation session was carried out under sufficiently different circumstances so as to have cured the initial taint. Seibert, 542 U.S. at 622 (Kennedy, J., concurring). In this instance, however, there was no intervening lapse of time between the warned and unwarned interrogations.[14] Cf. id. (a break between prewarning statements and advisement

---

[14] The hour and 20 minute break here occurred during the post-Miranda questioning.

31

of rights may suggest to a reasonable person that the two stages of interrogation are distinct). All of the relevant questioning here occurred in the same location, and with essentially the same interrogators. The focus of the two consecutive interrogation sessions was identical, as were the questions asked. And although neither agent engaged in express questioning pre-Miranda, for purposes of our constitutional analysis, there is no difference between showing Defendant a video of him engaging in a criminal act and informing him of the existence of such evidence against him. None of these undisputed facts indicate that any sort of curative measures were undertaken in Defendant's case.

On the other hand, we acknowledge that Green's initial pre-Miranda statements after seeing the video were not expressly inculpatory or particularly detailed, and that the prewarning interrogation session lasted only a few minutes. However, Defendant's prewarned statements, although not express, were nevertheless implicit admissions of guilt. See discussion *supra* Section II.B.1. Furthermore, in light of the fact that the entire interrogation session at issue here was relatively brief – not surprising given that the particular charged crime in this case consisted solely of a single hand-to-hand drug sale – we believe the factor of the exhaustive nature of the prewarning questioning and of the admissions is not particularly helpful to the sufficiency of the curative measures inquiry in this instance.

Under the unique circumstances before us, where everything occurred in one continuous span in the same place and with the same people, we think it unlikely that a reasonable person in Defendant's position would have viewed the pre- and post-Miranda questioning as distinct episodes, nor would he

32

have thought that he had a meaningful choice in whether to continue to make incriminating statements. See United States v. Aguilar, 384 F.3d 520, 525 (8th Cir. 2004) (excluding confession under Seibert). Unlike those of the vast majority of the cases that courts have encountered in the wake of Seibert, the record in this case is unambiguous that the initial violation of Miranda was not merely hapless or inadvertent, but rather was "an intentional withholding that was part of a larger, nefarious plot" to prevent Defendant from invoking his rights so as to gain his confession. Cf. Reinert v. Larkins, 379 F.3d 76, 91 (3d Cir. 2004) (no Seibert violation where police appear to have unintentionally neglected to administer Miranda warnings at the outset of questioning); United States v. Yamba, 407 F. Supp. 2d 703, 718 (W.D. Pa. 2006) (Hardiman, J.) (single unintentional unwarned question did not taint subsequent, warned interrogation and confession). This dangerous practice is precisely the type of systematic circumvention of Miranda that the Supreme Court sought to root out in Seibert, and we must thus decline to countenance these highly irregular procedures here. Because we find that insufficient curative measures were undertaken in Defendant's case, Seibert requires the exclusion of Green's post-Miranda statements as well.

### 3. Harmlessness

Finally, although the admission of Defendant's pre- and post-Miranda statements was plainly contrary to settled constitutional principles, we may not reverse if we can determine "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 24 (1967); Mitchell, 145 F.3d at 579 (Chapman applies to constitutional errors). We have little

33

trouble concluding that the error here was not harmless under Chapman.

Defendant's admissions were a central part of the Government's case at trial. Indeed, the prosecutor highlighted Green's reactions and statements in her opening statement, elicited direct testimony pertaining to their substance in the Government's case-in-chief, and vigorously stressed their damaging impact at closing. Outside of these statements, the extent of the Government's properly admitted evidence consisted of a two-second audio recording of a phone call, a short video depicting the profile of the suspect engaging in a drug transaction, and the testimony of two DEA agents that Defendant was seen entering the location of the controlled buy, and that it was Defendant who spoke on the tape and was caught on the video. The defense parried with the testimony of Michael Brown, the confidential informant involved in the controlled transaction, that it was not Green who sold him the drugs in the May 2002 transaction. While the Government did make some headway during cross-examination in suggesting to the jury that Brown was not the most convincing witness, the CI nevertheless remained steadfast to his account of the events. Under these circumstances, and in light of the fact that the identity of the individual depicted in the videotape was perhaps *the* most hotly contested issue at trial, we cannot imagine that Green's improperly admitted statements confessing to his involvement did not impact the verdict. We thus must reverse, because the error here was not harmless beyond a reasonable doubt.

34

III. CONCLUSION

The District Court erred in admitting the written statement of the confidential informant as a present-sense impression. Additionally, the admission of Defendant's pre- and post-<u>Miranda</u> statements violated due process, and seriously impaired the fairness and integrity of the trial; when a complained-of error is one of such a significant constitutional dimension, the failure to correct it would plainly result in a fundamental miscarriage of justice. Since none of these errors were harmless under the relevant standards, we must therefore vacate Green's conviction and remand the matter for a new trial.